JUDGE FURMAN

LAW OFFICE OF FELIX Q. VINLUAN
Felix Q. Vinluan (FV6788)
469 Seventh Avenue, Suite 404
New York, NY 10018
Tel. No. 212-359-9578
Fax No. 212-359-9568
*Attorneys for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MA CECILIA M. DELGADO, RONALD L. ESPIRITU,
GIVENCHY MAE C. ALBERTO, JEROME M. ALMILLA,
ANTHONY S. ANTONIO, PATRICIA A. BALLESTEROS,
CONSTANTE L. BAUTISTA, LESTER P. CAMPOS,
REYNALDO P. DE LUNA, MARS A. ESCOBIDO,
ARIEL C. GADICHO, JOEL E. NIPALES,
MOISES JOHN T. QUE, IVAN GEORGE C. SANICO,
JOHN S. SARMIENTO, ANNABELLE D. SIBAYAN
and HANSEL H. YUSON,

                               *Plaintiffs,*

    - against -

JOSE B. VILLANUEVA, SAN VILLA SHIP
MANAGEMENT COMPANY, LINCOLN ROAD
EMPLOYMENT ADVISORY SERVICES, LLC,
SOUTH BEACH EMPLOYMENT ADVISORY
SERVICES LLC, LORNA MELGAREJO and
JUCILYN VILLANUEVA,

                               *Defendants.*

CV No. _____ ___

COMPLAINT

Trial by Jury

-------------------------------------------------------------------x

     **Plaintiffs** MA. CECILIA M. DELGADO, RONALD L. ESPIRITU,

GIVENCHY MAE C. ALBERTO, JEROME M. ALMILLA, ANTHONY S.

ANTONIO, PATRICIA A. BALLESTEROS, CONSTANTE L. BAUTISTA,

LESTER P. CAMPOS, REYNALDO P. DE LUNA, MARS A. ESCOBIDO,

ARIEL C. GADICHO, JOEL E. NIPALES, MOISES JOHN T. QUE, IVAN

1

GEORGE C. SANICO, JOHN S. SARMIENTO, ANNABELLE D. SIBAYAN and HANSEL H. YUSON, by undersigned counsel, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.     This action arises out of Defendants' scheme to defraud Plaintiffs through false representations resulting in the forced labor, human trafficking and wage exploitation of the Plaintiffs by Defendants.

2.     Plaintiffs were brought into this country as H-2B guest workers from the Philippines under false promises of fair pay and humane treatment. Defendants knowingly and willfully conspired to recruit Plaintiffs from the Philippines, using fraudulent visa applications, false promises and misrepresentations regarding the terms and conditions of employment to induce Plaintiffs to work for Defendants in the United States.

3.     Defendants forced Plaintiffs to live in severely overcrowded housing and to work either long or no hours at all, in country clubs and hotels in Florida, South Carolina, and in New York. To ensure that Plaintiffs complied with their demanding work schedules or to ensure that Plaintiffs continued to stay with Defendants despite the absence of job availability, Defendants threatened Plaintiffs with arrest, imprisonment, deportation, cancellation of their visas, loss of work, lawsuits and blacklisting, and convinced Plaintiffs that they had close relationships with officials in the U.S. and Philippine governments. Defendants also deducted exorbitant monthly fees from Plaintiff's paychecks for recruitment fees, which are considered illegal under H-2B regulations. As a result of this campaign of fraud and coercion, Plaintiffs remained in constant fear of the

Defendants and believed they had no choice but to obey their orders and continue working.

4.    Plaintiffs assert claims arising from violations of the r rights under the Trafficking Victims Protection Act (18 U.S.C. §1589 and 18 U.S.C. §1590); Alien Tort Statute (28 U.S.C. §1350); Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1962(c) and 1962(d)); Fair Labor Standards Act (19 U.S.C. §§201 et seq.); and common law.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 18 U.S.C. §1595(a), a federal question, this action arising under the Trafficking Victims Protection Act (TVPA); by 28 U.S.C. §1350, this action arising under the Alien Tort Statute; by 18 U.S.C. §1964(c), this action arising under the Racketeering Influenced and Corrupt Organizations Act (RICO); by 29 U.S.C. §216(d), this action arising under the Fair Labor Standards Act (FLSA); by 28 U.S.C. §1337, this action arising under Acts of Congress regulating commerce; and by 28 U.S.C. §1331, this action arising under the U.S. Constitution and federal laws.

6.    This Court has supplemental jurisdiction over the related common law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. §1367.  Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

7.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims

occurred in the Southern District of New York.   Venue is proper pursuant to 18
U.S.C. §1965.

## PARTIES

8.     Plaintiffs Ma. Cecilia M. Delgado ("Delgado"), Ronald L. Espiritu
("Espiritu"),  Givenchy  Mae  C.  Alberto  ("Alberto"),  Jerome  M.  Almilla
("Almilla"),  Anthony  S.  Antonio  ("Antonio"),  Patricia  A.  Ballesteros
("Ballesteros"), Constante L. Bautista ("Bautista"), Lester P. Campos ("Campos"),
Reynaldo P. De Luna ("De Luna"), Mars A. Escobido ("Escobido"), Ariel C.
Gadicho ("Gadicho"), Joel E. Nipales ("Nipales"),  Moises John T. Que ("Que"),
Ivan George C. Sanico ("Sanico"), John S. Sarmiento ("Sarmiento"), Annabelle
D.  Sibayan  ("Sibayan"),  and  Hansel  H.  Yuson  ("Yuson")  (collectively,
"Plaintiffs") are citizens of the   Philippines.   Plaintiffs entered the United States
lawfully sometime between 2007 and 2009 on H-2B visas to perform labor.

9.     Defendant Jose B. Villanueva (hereinafter, "Villanueva") is, upon
information and belief, the President, Chief Executive Officer, director, member
and representative of each of Defendants San Villa Ship Management Company,
Lincoln  Road  Employment  Advisory  Services  LLC  and  South  Beach
Employment Advisory Services LLC.

10.     Defendant San Villa Ship Management Company (hereinafter,
"San Villa Management") is, upon information and belief, a Florida corporation
with its principal office address located at 2425 NW 33rd Avenue, 2nd Floor,
Miami, FL 33142, or at Defendant Villanueva's address.

11.     Defendant Lincoln Road Employment Advisory Services LLC (hereinafter, "Lincoln Road Employment Services") is a limited liability company organized under the laws of the state of Florida, with principal office address at 2425 NW 33rd Avenue, 2nd Floor, Miami, FL 33142, or, upon information and belief, at Defendant Villanueva's address.

12.     Defendant South Beach Employment Advisory Services LLC (hereinafter, "South Beach Employment Services") is a limited liability company organized under the laws of the state of Florida, with principal office address located at 2425 NY 33rd Avenue, 2nd Floor, Miami, FL 33142, or, upon information and belief, at Defendant Villanueva's address.

13.     Upon information and belief, Defendant Villanueva owns, manages and supervises each of the three Defendant-companies (San Villa Management, Lincoln Road Employment Services and South Beach Employment Services) and other similarly-incorporated business entities under his name and/or with similar address, all of which, together with individual Defendants, are hereinafter collectively referred to as the "San Villa Group Defendants".

14.     San Villa Management is a labor staffing company that, upon information and belief, had gross annual revenue income of at least $500,000.

15.     Lincoln Road Employment Services is a labor staffing company that, upon information and belief, had gross annual revenue income of at least $500,000.

16.    South Beach Employment Services is a labor staffing company that, upon information and belief, earned gross annual revenue income of at least $500,000.

17.    Defendant Lorna Melgarejo (hereinafter, "Melgarejo") was, upon information and belief, the Chief Financial Officer, director, employee, member or agent/representative of each of Defendants San Villa Management, Lincoln Road Employment Services and of South Beach Employment Services.

18.    Defendant Jucilyn Villanueva (hereinafter, "Jucilyn") was, upon information and belief, an agent, employee and representative of each of San Villa Management, Lincoln Road Employment Services, and of South Beach Employment Services, at all times relevant to this action.

19.    Upon information and belief, Defendant Villanueva determined Plaintiffs' respective places of employment and established the terms of their employment.

20.    Upon information and belief, Defendant Melgarejo selected Plaintiffs' respective places of employment, established the terms of their employment, controlled their work schedules, and supervised their work.

21.    Upon information and belief, Defendant Jucilyn selected particular Plaintiffs to work at New York worksites, established the terms of their employment, controlled their work schedules, and supervised their work.

22.    At all times relevant to this action, each of the above-named Defendants was an employer of each Plaintiff within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§201 et seq.

23.     At all times relevant to this action, Plaintiffs were "employees" of each Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C.§§201 et seq.

24.     At all times relevant to this action, Plaintiffs were engaged in commerce, the production of goods for commerce, and/or were employed in enterprises engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C., 29 U.S.C. §§206(a) and 207(a).

25.     At all times relevant to this action, the San Villa Group Defendants constituted a unified operation, were under common control for a common business purpose, had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and had an aggregate annual gross volume of business of at least $500,000.

## STATEMENT OF FACTS

26.     According to the recently released U.S. State Department's 2011 Trafficking in Persons Report, "[t]he Philippines is a source country", and "a significant number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary servitude."

27.     "Filipino migrant workers ... who became trafficking victims were often subject to violence, threats, inhumane living conditions, nonpayment of salaries and withholding of travel and identity documents.     "Fraudulent recruitment practices and the institutionalized practice of paying recruitment fees often left workers vulnerable to forced labor [and] debt bondage."

28.     Unfortunately, "law enforcement officials' complicity in human trafficking remains a pervasive problem in the Philippines, and corruption at all levels of government enables traffickers to prosper.   There continued to be reports that officials in government units and agencies assigned to enforce laws against human trafficking permitted trafficking offenders to conduct illegal activities."   This perception contributes to overseas workers' own sense of vulnerability to threats and complete control by their traffickers and prevents them from feeling safe enough to report their traffickers' activities or return to the Philippines.

### Defendants' Exploitation and Trafficking of Guest Workers from the Philippines

29.     During 2006 through 2009, Defendants, directly and through their agents, recruited Plaintiffs from the Philippines to perform work in the United States.

30.     Defendants recruited guest workers from the Philippines under the H-2B visa program.   During the recruitment, Defendants provided Plaintiffs and other San Villa recruits with false and misleading information about the terms and conditions of their employment and required them to incur significant debts. Defendants also misled the U.S. government by providing inaccurate information on the H-2B visa applications and Department of Labor certification forms submitted for Plaintiffs, including the location and amount of work and pay.

31.     Defendants required all of the Plaintiffs to deposit money amounting to at least fifty thousand pesos (P50,000) to a hundred thousand pesos (P100,000), as and by way of security deposit just in case Plaintiffs would leave

their employment with the Defendants before the end of their contracts. Plaintiffs who had to borrow money from lenders and relatives to raise these security deposits were surprised to learn belatedly that these amounts had been withdrawn without their knowledge and consent by the Defendants.

32.    Defendants created an atmosphere of complete control by representing to Plaintiffs their apparent influence on officials in the United States and of the Philippines.

33.    Defendants introduced a U.S. immigration officer and the Philippine Honorary Consul to the Plaintiffs as friends of Defendants. Defendants also made claims about their relationships to officials in the Philippines. Defendants used these relationships to create feelings of both fear and helplessness in Plaintiffs.

34.    Defendants obligated Plaintiffs to reside in severely overcrowded staff houses that were strictly controlled by Defendants. Once employed by Defendants, Plaintiffs were monitored, intimidated, threatened, and forced to live in unsafe and severely overcrowded housing.

35.    Defendants required Plaintiffs to work in conditions, locations and positions different than those contained in Defendants' H-2B visa applications.

36.    Generally during their initial periods of employment, Plaintiffs were required to work long hours. However, at times, and especially during the latter part of Plaintiffs' employment, Defendants failed to provide Plaintiffs with any work at all. Defendants also underpaid Plaintiffs and charged them

unlawfully for recruitment fees in the amount of $690 each, which amount was deducted from the Plaintiffs' first three monthly pay checks.

37.    In order to maintain their control, Defendants threatened Plaintiffs with arrest, deportation, jail, and cancellation of their visas.

38.    As a result of Defendants' conduct, Plaintiffs suffered serious emotional and financial distress, harm to their immigration status, and ongoing disruption to their lives.

39.    Many of Defendants' employees, including Plaintiffs, eventually had to escape from the conditions of coercion and control imposed on them by Defendants.

### Fraudulent Recruitment of Plaintiffs by Defendants

40.    During 2006 through 2009, Defendants sought and obtained H-2B visas to bring workers from the Philippines to the United States.

41.    Upon information and belief, Defendants fraudulently obtained H-2B visas by misrepresenting the pay, location and type of work guest workers would perform, including all the Plaintiffs.

(a-1) San Villa Management's Application for Alien Employment Certification, a form that must be submitted to the U.S. Department of Labor in order to secure H-2B guest workers, signed by Defendant Villanueva, in September 2008 stated that the 20 guest workers sought would be employed as waiters and waitresses at the Kiawah Island Club in Kiawah Island, South Carolina.

(a-2)   On the same form, Defendant Villanueva also certified that each employee would work one shift per day, five days per week at an hourly rate of $7.13.

(a-3) On San Villa Management's November 13, 2008 Petition for Nonimmigrant Workers, submitted to U.S. Citizenship and Immigration Services, Defendant Villanueva similarly certified that twenty (20) unnamed workers would work at Kiawah Island Club as waiters and waitresses and work full-time, earning $7.13 per hour.

(a-4)   Some Plaintiffs became beneficiaries of the approved petition (EAC-09-037-51891) filed by San Villa for twenty waiters and waitresses to work at Kiawah Island Club, but did not actually work at the stated worksite, or did not receive the stated pay rate or did not perform the stated job position.

(b-1)   Lincoln Road Employment Services' Application for Alien Employment Certification, which was approved by the U.S. Department of Labor, and which was signed by Defendant Villanueva, stated that Lincoln Road needed thirty (30) housekeepers to work at the W Hotel in Miami Beach, Florida from October 26, 2009 to October 1, 2010.

(b-2)   On Lincoln Road Employment Services' October 30, 2009 Petition for Nonimmigrant Workers submitted to the U.S. Citizenship and Immigration Services, Defendant Villanueva certified that the thirty (30) housekeepers would work at Miami Beach, FL at an hourly rate of $8.28.

(b-3)   Some Plaintiffs became beneficiaries of the approved petition (EAC-10-023-52000) filed by Lincoln Road Employment Services for

thirty housekeepers to work at the W Hotel, but did not actually work at the stated worksite, or did not receive the stated pay rate or did not perform the stated job position.

(c-1)   Sometime in 2007, San Villa Management filed another Application for Alien Employment Certification for one hundred forty five (145) waiters and waitresses to work at various country clubs in Florida.   Upon information and belief, the application was certified by the U.S. Department of Labor.

(c-2)   On San Villa Management's July 16, 2007 Petition for Nonimmigrant Workers submitted to the U.S. Citizenship and Immigration Services, Defendant Villanueva certified that each of the 145 worker-beneficiaries would receive an hourly wage of $6.67 as a waiter or waitress.

(c-3)   Some Plaintiffs became beneficiaries of the approved petition (EAC-07-212-52666) filed by San Villa for one hundred forty five waiters and waitresses to work at various Florida country clubs, but did not actually work at the stated worksite, or did not receive the stated pay rate or did not perform the stated job position.

(d-1)   Sometime in 2007, San Villa Management filed another Application for Alien Employment Certification for twenty five (25) cooks to work at The Admiral's Club in Jupiter, Florida.  Upon information and belief, the application was certified by the U.S. Department of Labor.

(d-2)   On San Villa Management's July 16, 2007 Petition for Nonimmigrant Workers submitted to the U.S. Citizenship and Immigration

Services, Defendant Villanueva certified that each of the 25 worker-beneficiaries would receive an hourly wage of $7.91 as a cook.

        (d-3)   Some Plaintiffs became beneficiaries of the approved petition (EAC-07-212-52708) filed by San Villa for twenty five cooks to work at The Admiral's Club, but did not actually work at the stated worksite, or did not receive the stated pay rate or did not perform the stated job position.

        42.    Upon information and belief, Defendants violated U.S. immigration laws by failing to file Form I-129 Petition for Change of Employer to the U.S. Citizenship and Immigration Services for each new site where they employed Plaintiffs.  Instead, Plaintiffs were forced to accept jobs at new sites and were thus forced to work without legal authorization displacing qualified U.S. workers.

        43.    Upon information and belief, Defendants failed to comply with the work schedules and job duties promised, and failed to place Plaintiffs with the employers they identified on the visa applications San Villa Management and/or Lincoln Road Employment Services submitted to the U.S. government.

        44.    As detailed below, Defendants employed most of the Plaintiffs in other types of positions.

        45.    Defendant Villanueva traveled to the Philippines to secure workers for the San Villa Group Defendants.

        46.    Defendants utilized Eurasian Quest and San Villa Manpower Agency Corp., both labor recruitment and training companies located in the

Philippines, as their agents to facilitate the recruitment and training of Filipino nationals to work for the San Villa Group Defendants in the United States.

47.     Defendant Villanueva visited Eurasiam Quest and San Villa Manpower Agency Corp. offices in the Philippines and met with prospective San Villa Group employees in the Philippines during approximately 2006 through 2009.

48.     Defendants Villanueva and Melgarejo directly participated in the recruitment of, and securing of visas for Plaintiffs and other prospective employees to work for San Villa Group Defendants.

49.     During the recruitment process and subsequent employment of Plaintiffs, Defendants Villanueva, Melgarejo and Jucilyn acted as agents, employees or officers, and representatives of San Villa Group Defendants.

50.     At all times relevant to this action, Defendants Villanueva, Melgarejo and Jucilyn were acting within the scope of their employment as agents, employees, officers and representatives of San Villa Group Defendants.

51.     Defendant Villanueva interviewed each Plaintiff prior to offering them a position with the San Villa Group Defendants.

52.     During the recruitment of Plaintiffs and other guest workers, Defendant Villanueva knowingly provided false information to government officials about the amount and type of work, wage and benefits offered by San Villa Group Defendants.

53.     During the multiple meetings organized by Eurasiam Quest and San Villa Manpower Agency Corp. in order to induce Plaintiffs to work for San

Villa Group Defendants. Defendant Villanueva knowingly provided Plaintiffs false and/or misleading information about the amount and type of work, wages, and benefits offered by the San Villa Group.

(a)     Defendant Villanueva informed Plaintiffs that San Villa Management would eventually sponsor them for a "green card" or lawful permanent residency in the United States;

(b)     Defendant Villanueva informed Plaintiffs that they would be provided free housing and transportation while employed by San Villa

(c)     Defendant Villanueva told Plaintiffs that their regular work hours would be eight hours per day;

(d)     Defendant Villanueva told Plaintiffs that they would have ample opportunity to work in the United States, including overtime hours;

(e)     Defendant Villanueva told Plaintiffs that there were jobs already awaiting them in the United States;

(f)     Defendant Villanueva told particular Plaintiffs that they would be employed as waitresses or waiters, as cooks or chefs, or as housekeepers.

54.     By inducing Plaintiffs and other recruits to accept employment with the San Villa Group, the misrepresentations made by Defendant Villanueva served one of the purposes for which he was employed by the San Villa Group Defendants.

55.    From approximately 2006 through 2011, Defendants promised to offer and/or offered Plaintiffs, along with other Filipino H-2B workers, jobs in the United States.

56.    As a result of the misrepresentations made by Defendants, each Plaintiff accepted Defendant's offer of employment, all of them undertaking significant debt, foregoing other employment opportunities and leaving their families to earn a livelihood working for the San Villa Group.

57.    Plaintiffs were required to incur significant expenses to secure employment with San Villa Group.

58.    The required recruitment fees and employment-related expenses were so high that all the Plaintiffs had to enter into debt in order to pay them.

59.    The mandatory fees included: medical examination fees, visa application fees, and a fee paid to the Philippine Overseas Employment Agency (POEA), a Philippine agency.  Plaintiffs were also required to pay fees for training and certification in English proficiency and in food and beverage services.

60.    The fees paid by each of the Plaintiffs totaled between approximately at least sixty thousand pesos (P60,000) to one hundred twenty thousand pesos (P120,000).

61.    Prior to Plaintiffs' departure for the United States, Defendants, through their agents at the Eurasiam Quest or at the San Villa Manpower Agency Corp., or through Defendant Villanueva himself, required each of the Plaintiffs to

sign a Seasonal Contract with either Defendant San Villa Management or with Defendant Lincoln Road Employment Services.

62.     The written contracts did not include several important promises made to Plaintiffs by Defendants, including those relating to free housing, transportation and overtime hour payments.

63.     Defendants, through their Philippine agents, San Villa Manpower Agency Corp., or through Defendant Villanueva himself, required each Plaintiff to sign blank documents, including another set of employment contracts, just before the Plaintiffs' departure to the United States.  Defendants promised to give each Plaintiff a copy of the completed contract upon arrival in the United States.

64.     Defendants, directly and through their agents at San Villa Manpower Agency Corp., told Plaintiffs that the Seasonal Contracts they signed were created only to show US Embassy officials and immigration officials at the airport, and that the previous promises made to them would be included in their real and accurate contracts which they would receive once they arrived in the United States.

### Defendants' Coercion and Control of the Plaintiffs

65.     After using false and misleading promises about their employment to entice Plaintiffs into debt, and in most cases, out of legal status to work for San Villa Group Defendants, Defendants used a variety of tactics to exercise control over Plaintiffs and coerce them to work.

66.     Defendants gained and maintained control over Plaintiffs by actively promoting the impression that they wielded power and influence within

the U.S. and Philippine governments and within Philippine and U.S. society, and that those who did not obey them would be made to suffer the consequences, such as arrest and deportation, or revocation of immigration status.

67.     Defendants increased the pressure on Plaintiffs, newly arrived to the United States, by ensuring that they remained isolated and marginalized from the alien society around them.  Defendants advised Plaintiffs not to mingle with other Filipino immigrants outside of the San Villa Group Defendants.

68.     Defendants also used false promises of visa renewal and permanent legal status to retain Plaintiffs and maintain control over them

69.     Defendants also held critical immigration documents of the Plaintiffs, deliberately increasing their sense of powerlessness to leave.

70.     Defendants exercised their control over Plaintiffs and forced them to work constantly by regularly leveling threats of arrest, deportation, blacklisting, lawsuits, and visa cancellation against the Plaintiffs.

*U.S. Immigration Officer*

71.     On at least three occasions, two of which were general staff meetings, and the third one, being a company party, Defendant Villanueva introduced Plaintiffs to Nenita Giessmann, a USCIS immigration officer based in Miami, Florida.  Upon information and belief, Ms. Giessmann is Defendant Villanueva's girlfriend.

72.     During said meetings, Defendant Villanueva spoke to the Plaintiffs and other employees that his companies can transfer each Plaintiff to one of his other companies every H-2B season, and that while the transfer petitions are

pending adjudication with the U.S. Citizenship and Immigration Services, the workers can legally continue working for the San Villa Group.

73.     Defendant Villanueva likewise asserted in front of Ms. Nenita Giessmann that if ever the Immigration Service denies one of his petitions, his company can go up on appeal on three different levels, and while the appeal is pending, the covered employees could continue working for his San Villa Group.

74.     Many Plaintiffs noticed Ms. Giessmann nodding her head in agreement during Defendant Villanueva's speech, giving semblance to Plaintiffs' minds that what Defendant Villanueva discussed about H-2B transfer petitions and appeals was legally correct.

*Philippine Honorary Consul*

75.     Sometime in 2008, Defendant Melgarejo introduced Plaintiffs Delgado and Espiritu to Dr. Angelo Macatangay, the Philippine government's Honorary Consul based in Florida, as a friend of Defendants, especially of Defendant Villanueva.

76.     During this meeting, Honorary Consul Macatangay admitted to Plaintiffs Delgado and Espiritu that he would assist Defendant Villanueva in whatever way he could regarding Defendants' legal problems as he allegedly owed Villanueva a debt of gratitude for previously assisting him during his trip to the Philippines.

77.     In October 2009, Plaintiff Que, together with other H-2B workers sponsored by the San Villa Group Defendants, met with Honorary Consul Macatangay to complain about Defendants. The Consul required them to state

their complaints in writing, but nothing came out of their complaints, as Plaintiff Que and the others later found out that the Honorary Consul was a close friend of Defendant Villanueva.

78.     Sometime in December 2010, Plaintiff Ballesteros called up Honorary Consul Macatangay to report Defendants' violations of their contracts and H-2B sponsorship, and to ask for assistance from the Philippine government, especially about repatriation. However, when Consul Macatangay admitted that he was friends with Defendant Villanueva, Plaintiff Ballesteros got scared and immediately hung up the phone.

79.     During at least two staff meetings, Defendant Villanueva informed Plaintiffs and other H-2B workers that he could easily report any worker leaving his employment to the Honorary Consul, as what he had previously done to some wielders who had escaped his employment. Defendant Villanueva informed Plaintiffs that he could request that they be blacklisted with the Philippine agencies and would no longer be able to work overseas.

*Influence in the Philippines*

80.     In the presence of Plaintiffs and other H-2B workers, Defendant Villanueva stated that his family knew people who could be hired to hurt or harass people in the Philippines.

81.     Defendant Villanueva informed Plaintiffs and other San Villa Group employees that he had influence and power in the Philippines.

**Verbal Abuse**

82.     In the presence of Plaintiffs Delgado and Espiritu, Defendant Villanueva cursed at some Plaintiffs who had complained about their pay and demanded the release of their Form I-94 cards.

## Abuse and Threatened Abuse of the Legal System

83.     Defendants used misrepresentations, promises, and threats regarding visas and immigration status to control Plaintiffs.

84.     Defendant Villanueva made misrepresentations to the Plaintiffs during their recruitment and throughout their employment regarding San Villa Group Defendants' ability and willingness to provide them with H-2B visas and/or status.

85.     Defendant Villanueva assured each Plaintiff that his San Villa Group would timely file for the extension and/or transfer of each Plaintiff's H-2B status, and that while the petition was pending, each Plaintiff could legally continue working for his company.

86.     Defendant Villanueva threatened several H-2B workers in front of some Plaintiffs that San Villa Group would not renew their visas if they failed to comply with San Villa Group's work assignments, or if they continued complaining about their wages and their Form I-94 cards, which would have rendered them unable to continue working lawfully in the United States and subject them to deportation.

87.     Defendant Villanueva made these threats even though he and other Defendants were clearly violating the H-2B program by forcing Plaintiffs to work at locations other than those approved by the U.S. government.

88.     Throughout their employment, Defendant Villanueva informed Plaintiffs and other San Villa Group employees that, if they left San Villa Group, he would cancel their visas and no other employer could hire them.

89.     Plaintiffs were frightened by Defendants' continuous threats, particularly because, as Defendants knew, Plaintiffs were working to pay back the debts acquired to come to the United States and work for San Villa Group.

## Document Holding

90.     Defendants promised each Plaintiff that their respective H-2B status would be transferred and/or extended by Defendants.

91.     When Plaintiffs were granted the transfer or extension of their H-2B status, Defendant Villanueva withheld and refused to provide them the original copies of the new Form I-94 cards.

92.     The Form I-94 card is the primary proof that a nonimmigrant alien is lawfully present in the United States. The document includes a stamp of the date when a nonimmigrant is admitted and the date when s/he must depart. When an individual's visa is renewed (transferred or extended), the alien receives an updated Form I-94 card, which is attached to the Form I-797 approval Notice of Action issued by the U.S. Citizenship and Immigration Services.

93.     Defendant Villanueva often always advised San Villa Group employees, including Plaintiffs, that their respective H-2B petitions have been filed and/or were pending, and that they did not have to worry about their immigration status as "it was ok".

94.    Some Plaintiffs got photocopies of their new Form I-94 cards only after the expiration of said cards, and only when another transfer or extension petition was allegedly filed in his/her behalf for the next working season.

95.    As a result of having their original immigration and identification documents held, Plaintiffs felt they were unable to leave San Villa Group Defendants.

### Threats Regarding Arrest, Detention and Deportation

96.    Defendant Villanueva made ongoing threats to, and in the presence of, Plaintiffs regarding the arrest, detention and deportation of any San Villa Group employee who stopped working for San Villa Group.

97.    Defendant Villanueva told Plaintiffs that if any San Villa Group employees escaped, he would call the police or immigration enforcement to find them.

98.    Defendant Villanueva told Plaintiffs that they would be escorted to be deported if they tried to escape and were caught.

99.    Defendant Villanueva told Plaintiffs that if any San Villa Group employee fled, Defendants could use the employee's social security number to find them wherever they went.

100    Defendant Villanueva told Plaintiffs that he would "blacklist" any San Villa Group employee with the Philippine Overseas Employment Administration (POEA) if such employee would escape, so that such employee would face negative immigration consequences and would be unable to work overseas in the future.

101.   Defendant Villanueva's threats were made on a regular basis, including during staff meetings.

102   Defendants used the above threats to compel Plaintiffs to work for employers not authorized by their H-2B visas.

### Threats of Litigation

103.   Defendant Villanueva also told Plaintiffs that San Villa Group Defendants could sue any of them if they violated their employment contracts or if they left their employment.

104.   By serving to ensure Plaintiffs' and other guest workers' compliance with San Villa Group's abusive working requirements and prevent Plaintiffs and other guest workers from leaving San Villa Group, the threats and other acts of intimidation on the part of Defendant Villanueva served purposes for which Defendant Villanueva was employed by the San Villa Group Defendants.

105.   Plaintiffs suffered emotional distress due to both the Defendants' coercive tactics and Plaintiffs' resulting forced labor.

106.   The emotional effects suffered by Plaintiffs include disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

### Substandard Living Conditions

107.   Defendants required Plaintiffs to live in severely overcrowded housing in both Florida and in New Jersey.

108.   The housing accommodations provided by Defendants were unequipped to house the numbers of San Villa Group employees Defendants assigned to them.

109.   While living in the San Villa Group housing, Plaintiffs and other San Villa Group employees slept on floors, air mattresses, and in hallways and common areas.  Some beds Defendants provided were infested with bedbugs.

110.   Due to the insufficient number of bathrooms in San Villa Group housing, some Plaintiffs had to get up several hours earlier than they otherwise would each morning to use the bathrooms.  Given the considerable hours Plaintiffs typically worked, being forced to get up early meant Plaintiffs received only a few hours of sleep some nights.

111.   There was a complete lack of privacy in the severely overcrowded housing provided by Defendants.

112.   Defendants, both directly and through their designated agents, controlled the San Villa Group housing.  They or their agents required Plaintiffs to seek permission prior to leaving, held mandatory meetings, and monitored Plaintiffs' activities within the house.

113.   Plaintiffs were also required to perform uncompensated work in the San Villa Group housing, including cleaning, cooking and employment-related trainings.

114.   In addition to the uncompensated work described above, Defendants required Plaintiffs Delgado, Espiritu, and three other H-2B workers to transport Defendants' other employees.

115.    Rents for the apartments provided by Defendants to be used by most of the Plaintiffs in New Jersey were not paid, and the landlord had to file eviction cases against most of the Plaintiffs.

116.    Upon information and belief, during the relevant time period, all Defendants were aware of the number and size of houses made available to Defendants' employees, including the Plaintiffs, and the approximate total number of San Villa Group Defendants' employees.

### Working Conditions

117.    While Defendants certified to the U.S. government and promised Plaintiffs that there were jobs awaiting them in the United States, some Plaintiffs had no regular, full-time work for weeks after their arrival.

118.    Defendants generally failed to provide all of the Plaintiffs with sufficient work at the start of each season while later requiring them to work up to approximately 60 or longer hours per week.

119.    As described above, Defendants required some Plaintiffs to work significant amounts of overtime.

120.    Plaintiffs were generally paid just once per month.

121.    Defendants regularly paid Plaintiffs two weeks or more than a month late.

122.    Plaintiffs were generally paid by direct deposit to their bank accounts.  Plaintiffs' accounts were set up at the direction of Defendants.

123.    Plaintiffs were paid from San Villa's bank account.

124.    Defendants did not consistently provide all Plaintiffs with records of payment detailing their pay, deductions, and withholdings.

125.    Upon information and belief, Defendants failed to post the required wage and hour postings as required by Florida, New York and federal laws.

126.    Defendants gave Plaintiffs misinformation about their right to overtime pay for all hours worked over 40 each week.

127.    Some Plaintiffs were unaware of their full rights to the applicable federal and state minimum wages and overtime premiums during their employment.

128.    Upon information and belief, Defendants failed to maintain proper records regarding Plaintiffs' work.

129.    Upon information and belief, Plaintiffs' time records were submitted to San Villa Group Defendants.

130.    Plaintiffs were also not compensated for travel time they spent being transported between job sites once their work day had begun.

### Failure to Pay Minimum, Overtime and Promised Wages

131.    Defendants failed to pay Plaintiffs the federal and state minimum wage for all hours worked.

132.    Defendants failed to pay Plaintiffs their promised wages.

133.    Defendants failed to pay Plaintiffs the required overtime premium of one and one half times their regular rate of pay for each hour worked in excess of forty each week.

### The New York Movement

134.   Sometime in May 2010, Defendants, through Defendant Villanueva, announced to Plaintiffs and to other H-2B workers that Defendants would transport them to work as housekeepers in New York hotels. The H-2B workers referred to this plan as the "New York Movement".

135.   Defendant Villanueva instructed Plaintiffs Delgado and Espiritu to start preparing for the move to New York by making truck reservations. Defendant Villanueva promised that everybody would be able to start work as early as July 2010.

136.   Defendants sent eighteen (18) H-2B workers, including Plaintiffs Delgado, Espiritu, De Luna, Sanico, Campos, Que, Antonio, and Gadicho, to travel from Miami, Florida on May 31, 2000 aboard three vehicles, two of which were owned by Defendant Villanueva.

137.   The 18 employees arrived in New Jersey on June 2, 2010 and were housed in two Jersey City apartment units rented out by Defendants Villanueva and Jucilyn to serve as the employees' residence.

138.   On June 9, 2010, Defendants Villanueva and Jucilyn instructed the 18 H-2B workers to prepare for visit and interview at the Holiday Inn Times Square, where Defendant Jucilyn, upon information and belief, also worked as Night Auditor.

139.   On several occasions, Defendant Jucilyn accompanied Plaintiff Delgado and other H-2B workers to travel from New Jersey to New York (Manhattan) to familiarize themselves with the city's transportation systems.

140.    On June 29, 2010, Defendants, through Defendants Villanueva and Jucilyn, instructed the 18 H-2B workers, including some Plaintiffs, to transfer to a two-storey house, also in Jersey City, where Defendants accommodated all 18 workers.

141.    In early July 2010, three other H-2B workers, including Plaintiff Almilla, were instructed by Defendant Villanueva to join the other H-2B workers in New Jersey to work in New York City hotels.

142.    Defendant Villanueva, upon information and belief, communicated to various managers of New York City hotels to find employment for his H-2B workers, including the Plaintiffs.

143.    Upon information and belief, Defendant Villanueva traveled to New York City several times to meet with his H-2B employees and to discuss with managers of New York City hotels.

144.    On August 7, 2010, Defendant Villanueva traveled to New York City to personally endorse eight of his H-2B employees, including some Plaintiffs, to work as housekeepers at the Intercontinental Hotel in Times Square.

145.    On August 11, 2010, Defendant Villanueva communicated to the restaurant chef of the Trump Soho Hotel in downtown Manhattan about the employment of two of the Plaintiffs as line cooks.

146.    On November 3, 2010, Defendant Villanueva personally brought some H-2B workers, including some Plaintiffs, to be interviewed at the Fairfield Hotel in Manhattan.  Defendant Villanueva's discussions with the hotel's General Manager did not result in Plaintiffs' employment.

147.    Defendant Villanueva communicated several times with Plaintiff Delgado, giving instructions for the Plaintiffs and other H-2B workers to apply personally as well as online with several New York City hotels.    Defendant Villanueva also instructed Plaintiff Delgado to research on job availabilities in New York City hotels.

148.    More than six months after Defendants sent Plaintiffs and other H-2B workers allegedly to work in New York City hotels, none of the H-2B workers were given any full-time permanent jobs by Defendants, or were regularly paid for all the time they made themselves available to work for the Defendants.

## Plaintiffs' Escapes from San Villa Group

149.    As a result of Defendants' exploitation, broker promises and coercion, Plaintiffs' exhaustion, emotional distress and financial hardships became intolerable, and they were forced to flee or to leave San Villa Group housing or to resign.

150.    Feeling desperate due to lack of promised employment, and also due to withheld wages and the knowledge of enormous debts still to be paid to Philippine creditors, Plaintiffs decided to cease their employer-employee relationship with Defendants.

## Additional Facts as to Plaintiff DELGADO

151.    Defendants, through Defendant Villanueva, interviewed Plaintiff Delgado sometime in February 2008 in the Philippines, whereby Defendant Villanueva informed Delgado about her future employment and the requirements by Defendants for the offered position.

152.   On February 22, 2008, Defendant's agents in the Philippines required Plaintiff Delgado to sign a Seasonal Contract with Defendant San Villa Management which stated that she would be employed as a waitress at the Loxahatchee Country Club at Palm Beach County, Florida, at the gross rate of $6.67 per hour.   The Agreement likewise provided that she would be provided employment five days or 40 hours per week.

153.   Plaintiff Delgado received her H-2B visa on February 26, 2008 under the sponsorship of Defendant San Villa Management (EAC-07-259-53469).

154.   Before Defendants gave Plaintiff Delgado's passport and plane ticket to come to the United States, they required her, through their Philippine agents, San Villa Manpower Agency, Corp., to open a bank account whereby she was made to deposit the amount of sixty thousand (P60,000) pesos to serve as security bond just in case she left Defendants' employ before the end of her contract.

155.   On March 6, 2008, upon the instructions of Defendants, Plaintiff Delgado left the Philippines for her employment as a waitress in the United States with Defendant San Villa Management.

156.   Upon her arrival in Florida, Plaintiff Delgado was surprised to find out that there was no job as a waitress waiting for her.

157.   After a week, Defendant Villanueva offered Plaintiff Delgado work as one of his office assistants.  She was paid an hourly wage of $6.88, but was not paid any overtime.

158.   In October 2008, Defendant Villanueva promoted Plaintiff Delgado to become his Executive Assistant, the position she occupied until her resignation.   As such Executive Assistant, Plaintiff Delgado was tasked by Defendants to assist Defendant Villanueva in, among others, the work assignments of the H-2B workers, in the preparation of payroll, in meeting with and discussing relationship issues with client-facilities, preparing invoices to client-facilities, and in being the liaison between Defendants and the H-2B workers.

159.   Upon information and belief, Defendants, using two or more of Defendant Villanueva's companies, filed extension and/or transfer petitions on behalf of Plaintiff Delgado, which petitions, including petitions with case numbers EAC-08-143-53179 and EAC-08-248-51479, were allegedly approved or were pending or in process.  Plaintiff Delgado was not given original copies of the approval notices or notification as to what happened to the last petition filed in her behalf.  She was advised that for as long as there was a pending petition in her behalf, she could continue working for the Defendants.

160.   Plaintiff Delgado did not work or perform the duties of whatever position was stated in the extension and/or transfer petitions filed in her behalf by Defendants, but was made to assist Defendants in an administrative position.

161.   Sometime in May 2010, Plaintiff Delgado was advised by Defendant Villanueva that the latter would be transporting most of his H-2B workers to work as housekeepers in New York City hotels.

162.    Together with seventeen other H-2B workers, Plaintiff Delgado was transported, upon instructions by Defendants, from Florida to New Jersey, where they arrived on June 2, 2010 and where they were housed at extremely congested apartments.

163.    Plaintiff Delgado made herself available to work for Defendants during the whole time that she, together with other H-2B workers from Florida, was waiting for assignments at the New Jersey housing facilities rented by Defendants for them.

164.    Plaintiff Delgado joined trips to New York City organized by Defendants Villanueva and Jucilyn to familiarize themselves in the city's transport system and to look for employment opportunities in different hotels in Manhattan.

165.    Defendant Villanueva instructed Plaintiff Delgado to make research on available hotel jobs in New York City so that Defendants' H-2B workers, including Plaintiffs, could be interviewed and be given work assignments.

166.    Plaintiff Delgado waited for the next work assignment to be given to her by Defendants, but none came.

167.    Some Plaintiffs and other H-2B workers presented their complaints to Defendants through Plaintiff Delgado about the lack of work in New York. Plaintiff Delgado echoed the complaints to Defendants, but the complaints were not satisfactorily addressed by Defendants.

168.    On January 15, 2011, Plaintiff Delgado, after experiencing improper payment of her wages and the non-payment of her overtime hours, the

delayed release of her salaries, the non-provision of the original copies of her immigration documents, and the lack of full-time work towards the end of her employment, decided to resign from her employment, and left the housing facility that Defendants had provided for her and other H-2B workers.

### Additional Facts as to Plaintiff ESPIRITU

169.    Defendants, through Defendant Villanueva, interviewed Plaintiff Espiritu approximately sometime in December 2007 in the Philippines, whereby Defendant Villanueva informed Espiritu about his future employment and the requirements by Defendants for the offered position.

170.    On January 18, 2008, Defendant's agents in the Philippines required Plaintiff Espiritu to sign a Seasonal Contract with Defendant San Villa which stated that he would be employed as a waiter at the Delray Beach Club at West Palm Beach County, Florida at the gross rate of $6.67 per hour.    The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

171.    Plaintiff Espiritu received his H-2B visa on January 28, 2008 under the sponsorship of Defendant San Villa Management (EAC-07-212-52666).

172.    On February 7, 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp., required Plaintiff Espiritu to open a bank account whereby he was made to deposit the amount of fifty thousand (P50,000) pesos as and by way of security bond.

173.    On February 8, 2008, upon the instructions of Defendants, Plaintiff Espiritu left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

174.    Two weeks after his arrival, Defendants assigned Plaintiff Espiritu to the Delray Beach Club as a waiter, but compensated him only $6.00 an hour, and with no overtime pay.

175.    From September 6, 2008 to October 19, 2008, Plaintiff Espiritu was not given any work assignment by the Defendants.

176.    On October 20, 2008, Defendant Villanueva gave Plaintiff Espiritu a new assignment, this time as an Area Coordinator.   As such Area Coordinator, Plaintiff Espiritu was charged by Defendants with coordinating work assignments of H-2B workers, revenue collections from client-facilities, and transporting employees from and to housing facilities and client-sites.

177.    Upon information and belief, Defendants, using two or more of Defendant Villanueva's companies, filed extension and/or transfer petitions on behalf of Plaintiff Espiritu, which petitions, including petition with case number EAC-08-248-51479, were allegedly approved or were pending or in process. Plaintiff Espiritu was not given original copies of the approval notices or notification as to what happened to the last petition filed in his behalf.  He was advised that for as long as there was a pending petition in his behalf, he could continue working for the Defendants.

178.   Plaintiff Espiritu did not work or perform the duties of whatever position was stated in the extension and/or transfer petitions filed in his behalf by Defendants, but was made to assist Defendants in an administrative position.

179.   Sometime in May 2010, Plaintiff Espiritu was advised by Defendant Villanueva that the latter would be transporting most of his H-2B workers to work as housekeepers in New York City hotels.

180.   On May 31, 2010, Plaintiff Espiritu was instructed by Defendant Villanueva to drive one of three vehicles that would be transporting eighteen (18) H-2B workers from Florida to work in New York City hotels.

181.   Together with seventeen other H-2B workers, Plaintiff Espiritu arrived on June 2, 2010 in Jersey City, New Jersey, where they were housed at extremely congested apartments.

182.   Plaintiff Espiritu made himself available to work for Defendants during the whole time that he, together with other H-2B workers from Florida, was waiting for assignments at the New Jersey housing facilities rented by Defendants for them.

183.   Plaintiff Espiritu joined trips to New York City organized by Defendants Villanueva and Jucilyn to familiarize themselves in the city's transport system and to look for employment opportunities in different hotels in Manhattan.

184.   Plaintiff Espiritu waited for the next work assignment to be given to him by Defendants, but none came.

185.   In December 2010, Defendant Villanueva ordered Plaintiff Espiritu to return to Florida to pick up several H-2B workers still working at the Miami Beach area.

186.   Defendant Villanueva instructed Plaintiff Espiritu to advise the Miami H-2B workers that he was supposed to bring them to work as housekeepers in New York City hotels.

187   Following instructions by Defendant Villanueva, Plaintiff Espiritu brought the Miami H-2B workers instead to the West Palm Beach housing facility, where they were required to wait for further instructions from Defendant Villanueva.

188.   On March 15, 2011, Plaintiff Espiritu, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

### Additional Facts as to Plaintiff ALBERTO

189.   Defendants, through Defendant Villanueva, interviewed Plaintiff Alberto in June 2008 in the Philippines, whereby Defendant Villanueva informed Alberto about her future employment and the requirements by Defendants for the offered position.

190.   Plaintiff Alberto was required to undergo English proficiency and fine dining service training whereby Defendants, through their Philippine agents,

San Villa Manpower Agency, Corp., assessed her the amount of nine thousand (P9,000) pesos as training fee.

191.    Sometime in November 2008, Defendants, through their Philippine agents, required Plaintiff Alberto to open a bank account whereby she was made to deposit the amount of one hundred thousand (P100,000) pesos to serve as her security bond.

192.    On January 22, 2009, Defendant's agents in the Philippines required Plaintiff Alberto to sign a Seasonal Contract with Defendant San Villa Management which stated that she would be employed as a waitress from April 2009 to October 2009 at Kiawah Island Golf Resort in South Carolina, at the gross rate of $7.13 per hour.   The Agreement likewise provided that she would be provided employment five days or 40 hours per week.

193.    Plaintiff Alberto received her H-2B visa on January 23, 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

194.    On March 22, 2009, upon instructions by Defendants, Plaintiff Alberto left the Philippines for her employment as a waitress in the United States with Defendant San Villa Management.

195.    Starting April 2009 until September 2009, Defendants, through Defendant Villanueva, required Plaintiff Alberto to work as a pool attendant at the Kiawah Island Golf Resort, at an hourly rate of $6.00 and with no overtime pay.

196.    Defendants thereafter transported Plaintiff Alberto to Miami, Florida where she was assigned to work as a housekeeper for one year at the W Hotel earning $6.50 per hour.

197.    After her work as a housekeeper at the W Hotel, Plaintiff Alberto was not given any work assignment by the Defendants for more than two weeks.

198.    From October 2010 to March 2011, Defendants assigned Plaintiff Alberto to work as a back server at Quattro Restaurant in Miami, Florida.

199.    Sometime late 2009, Defendants, using Defendant Lincoln Road Employment Services as sponsor, filed a transfer petition (EAC-10-027-50882) of Plaintiff Alberto's H-2B status.  Upon information and belief, this petition was approved for the period between January 27, 2010 and April 1, 2010.

200.    Upon   information   and   belief,   Defendant   Lincoln   Road Employment Services filed an extension petition (EAC-10-143-50558) of Plaintiff Alberto's H-2B status, and which petition was approved.

201.    Upon information and belief, Defendants, using Defendant South Beach Employment Services as sponsor, filed a transfer petition (EAC-10-243-50573) of Plaintiff's H-2B status, which petition was approved for the period between October 18, 2010 and April 1, 2011.

202.    While working as a back server at the Quattro Restaurant, Plaintiff Alberto was advised by Defendant Villanueva that she would be transported to work as a housekeeper in a New York City hotel.

203.    Despite Defendant Villanueva's promise of work in New York, Plaintiff Alberto was not given any work assignment after her work at the Quattro Restaurant.

204.    After experiencing improper payment of her wages and the non-payment of her overtime hours, the delayed release of her salaries, the non-

provision of the original copies of her immigration documents, and the frequent lack of full-time work towards the end of her employment. Plaintiff Alberto decided to escape from Defendants' employment sometime in March 2011.

### Additional Facts as to Plaintiff ALMILLA

205.    Defendants, through Defendant Villanueva, interviewed Plaintiff Almilla approximately sometime in September 2007 in the Philippines, whereby Defendant Villanueva informed Almilla about his future employment and the requirements by Defendants for the offered position.

206.    Sometime in January 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp. required Plaintiff Almilla to open a bank account whereby he was made to deposit the amount of fifty thousand (P50,000) pesos to serve as his security bond.

207.    Sometime around January 2008, Defendant's agents in the Philippines required Plaintiff Almilla to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a cook at The Admiral's Club in Jupiter, Florida at the gross rate of $7.91 per hour.    The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

208.    Plaintiff Almilla received his H-2B visa on January 16, 2008 under the sponsorship of Defendant San Villa Management (EAC-07-212-52708).

209.    On January 22, 2008, upon the instructions of Defendants, Plaintiff Almilla left the Philippines for his employment as a cook in the United States with Defendant San Villa Management.

210.    Instead of assigning him at The Admiral's Club, Defendants, through Defendant Villanueva, required Plaintiff Almilla to work as a cook at the Quattro Restaurant in Miami, FL at an hourly rate of $6.50 and with no overtime pay.

211.    In October 2008, Defendant Villanueva pulled Plaintiff Almilla from the Quattro Restaurant and assigned him to work at The Loxahatchee Club in Jupiter, Florida where he was made to work as a cook at an hourly rate of $6.50.

212.    In May 2009, Defendants, through Defendant Villanueva, required Plaintiff Almilla to move to Miami, FL and to work as a cook at the W Hotel.

213.    Promising better wage rates and overtime pay, Defendant Villanueva promised Plaintiff Almilla and two other H-2B workers to move and to work in New York as housekeepers.

214.    Upon the instructions of Defendant Villanueva, Plaintiff Almilla, on June 30, 2010, joined the second batch of H-2B workers to leave Florida to go to New York.

215.    Upon information and belief, Defendant San Villa extended three times the H-2B status of Plaintiff Almilla, and which three petitions (EAC-08-150-53104; EAC-08-256-51961, and; EAC-09-158-52077) were approved with validity period ending on October 1, 2009.

216.    Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services as sponsor, filed a transfer petition (EAC-10-035-51367) of Plaintiff's H-2B status.

217.    When Plaintiff Almilla inquired as to the status of the H-2B transfer petition, Defendant Villanueva replied by stating that the petition was still pending, and that in the meantime Plaintiff Almilla could legally continue working.

218.    Defendant Villanueva reiterated to Plaintiff Almilla that his papers were still being processed by the Immigration Service and that he did not have to worry about his immigration status.

219.    Plaintiff Almilla made himself available to work for Defendants during the whole time that he, together with other H-2B workers from Florida, was waiting for assignments at the New Jersey housing facilities rented by Defendants for them.

220.    Sometime around July 19, 2010, Plaintiff Almilla, together with some Plaintiffs, complied with Defendant Jocilyn's instructions for them to go to the Intercontinental Hotel – Times Square to be interviewed.

221.    Starting from August 7, 2010 to August 11, 2010, Plaintiff Almilla, together with seven other H-2B workers, including some Plaintiffs, were assigned by Defendants to work at the Intercontinental Hotel – Times Square as housekeepers.

222.    On the night of August 11, 2010, Defendant Villanueva advised Plaintiff Almilla and Plaintiff De Luna that there were openings for the position of line cook at the Trump Soho Hotel in downtown Manhattan.

223.    After the initial interviews, Plaintiff Almilla, with Plaintiff De Luna, began their orientation at the Trump Soho Hotel.

224.    However, due to the inability of Defendants, particularly Defendant Villanueva, to provide the current Form I-94 cards of Plaintiffs Almilla and De Luna, Trump Soho Hotel terminated the services of Plaintiffs Almilla and De Luna on August 22, 2010.

225.    Plaintiff Almilla waited for the next work assignment to be given to him by Defendants, but none came.

226.    Thus, sometime in March 2011, Plaintiff Almilla, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

## Additional Facts as to Plaintiff ANTONIO

227.    Defendants, through Defendant Villanueva, interviewed Plaintiff Antonio approximately sometime in June 2007 in the Philippines, whereby Defendant Villanueva informed Antonio about his future employment and the requirements by Defendants for the offered position.

228.    Sometime in September 2007, Defendants, through their Philippine agents, Eurasiam Quest, required Plaintiff Antonio to open a bank account whereby he was made to deposit the amount of fifty thousand (P50,000) pesos as his security bond.

229.   In September 2007, Defendant's agents in the Philippines required Plaintiff Antonio to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a housekeeper at The Admiral's Club in Jupiter, Florida at the gross rate of $6.67 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

230.   Plaintiff Antonio received his H-2B visa on September 13, 2007 under the sponsorship of Defendant San Villa Management (EAC-07-217-53032).

231.   On September 29, 2007, upon the instructions of Defendants, Plaintiff Antonio left the Philippines for his employment as a housekeeper in the United States with Defendant San Villa Management.

232.   Defendants, through Defendant Villanueva, assigned Plaintiff Antonio as a housekeeper at The Admiral's Club in Jupiter, Florida at a gross rate of $6.00 per hour, and without any overtime pay.

233.   From September 2009 to October 2009, Defendants assigned Plaintiff Antonio to work as a housekeeper at the W Hotel in Miami Beach, Florida.

234.   From November 2009 to middle of May 2010, Defendants assigned Plaintiff Antonio to work as a housekeeper at The Admiral's Club in Jupiter, Florida.

235.   Upon information and belief, Defendants, using two or more of Defendant Villanueva's companies, filed extension and/or transfer petitions on behalf of Plaintiff Antonio, which petitions were allegedly approved or were

44

pending or in process.  Plaintiff Antonio was not given original copies of the approval notices or notification as to what happened to the last petition filed in his behalf.  He was advised that for as long as there was a pending petition in his behalf, he could continue working for the Defendants.

236.    On May 31, 2010, Plaintiff Antonio, together with seventeen other H-2B workers, including some Plaintiffs, left Florida upon the instructions by Defendants, through Defendant Villanueva, and moved to New Jersey to work as housekeepers in New York City-based hotels.

237.    On June 3, 2010, Defendant Jucilyn brought Plaintiff Antonio and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

238.    On July 9, 2010, Defendant Jucilyn again brought Plaintiff Antonio and seven other H-2B workers, including some Plaintiffs, to be interviewed at the Intercontinental New York Times Square Hotel.

239.    Upon instructions of Defendants, more particularly Defendants Villanueva and Joycelyn, Plaintiff Antorio joined other H-2B workers in presenting themselves for interview at New York City-based hotels, such as the Fashion 26 Hotel.

240.    On November 3, 2010, Defendants Villanueva and Joycelyn brought Plaintiff Antonio and other H-2B workers, including Plaintiffs Delgado, Que, Campos, and Sanico, to be interviewed at the Fairfield Hotel in Manhattan.

241.   Likewise upon instructions by Defendant Villanueva, Plaintiff Antonio and other H-2B workers participated in a job fair in January 2011 at the Grand Central Station in Manhattan.

242.   On March 28, 2011, Plaintiff Antonio, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work during the latter period of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

### Additional Facts as to Plaintiff BALLESTEROS

243.   Defendants, through Defendant Villanueva, interviewed Plaintiff Ballesteros in October 2009 in the Philippines, whereby Defendant Villanueva informed Ballesteros about her future employment and the requirements by Defendants for the offered position.

244.   Plaintiff Ballesteros was required to undergo English proficiency and hotel training whereby Defendants, through their Philippine agents, San Villa Manpower Agency Corp., assessed her the amount of nine thousand (P9,000) pesos as training fee.

245.   Sometime in November 2009, Defendants, through their Philippine agents, required Plaintiff Ballesteros to open a bank account whereby she was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

246.   On November 20, 2009, Defendant's agents in the Philippines required Plaintiff Ballesteros to sign a Seasonal Contract with Defendant Lincoln Road Employment Services which stated that she would be employed as a housekeeper from November 2009 to October 1, 2010 at the W Hotel in Miami Beach, Florida at the gross rate of $8.28 per hour.   The Agreement likewise provided that she would be provided employment five days or 40 hours per week.

247.   Plaintiff Ballesteros received her H-2B visa on November 24, 2009 under the sponsorship of Defendant Lincoln Road Employment Services (EAC-10-023-52000).

248.   On November 28, 2009, upon instructions by Defendants, Plaintiff Ballesteros left the Philippines for her employment as a housekeeper in the United States with Defendant Lincoln Road Employment Services.

249.   From December 2009 to September 2010, Defendants, through Defendant Villanueva, required Plaintiff Ballesteros to work as a housekeeper at the W Hotel and paid her an hourly rate of $6.00 and with no overtime pay for the first three months.  Starting on the fourth month, Plaintiff Ballesteros was paid by Defendants an hourly rate of $6.50.

250.   Sometime May 2010, Plaintiff Ballesteros and other H-2B workers learned that Defendants were planning to move their employees to work at New York City-based hotels.

251.   At the end of her work at the W Hotel and for three months thereafter, Plaintiff Ballesteros and Plaintiffs Bautista and Escobido were not given any work assignments by the Defendants, despite their making themselves

available to Defendants who continued to house them and promised them employment.

252.    Upon information and belief, Defendants, using Defendant South Beach Employment Services as sponsor, filed a transfer petition (EAC-10-243-50573) of Plaintiff Ballesteros' H-2B status.

253.    Defendant Villanueva notified Plaintiff Ballesteros that the transfer petition was approved, but failed to furnish Plaintiff Ballesteros a copy of the approval notice with the attached renewed Form I-94 card. Defendant Villanueva however advised Plaintiff Ballesteros that she could continue working for the Defendants.

254.    Sometime middle of December 2010, Defendant Villanueva instructed Plaintiff Espiritu to fetch Plaintiffs Ballesteros, Bautista and Escobido from Miami and to bring them to work in New York.

255.    However, Plaintiffs Ballesteros, Bautista and Escobido were brought to West Palm Beach, Florida upon the instructions of Defendant Villanueva, to await further developments of the hotel contracts being finalized allegedly by Defendant Villanueva with New York City-based hotels.

256.    For about another month, no work assignments were given to Plaintiff Ballesteros and her co-workers Bautista and Escobido.

257.    Sometime January 2011, Defendant Villanueva gave Plaintiffs Ballesteros, Bautista and Escobido part-time work assignments at Falls Country Club in West Palm Beach, Florida.

258.     Plaintiffs Ballesteros, Bautista and Escobido thereafter demanded from Defendant Villanueva that they be repatriated to the Philippines as they could hardly support themselves with the lack of full-time employment and the measly salaries they were receiving from Defendants.

259.     Defendant Villanueva threatened Plaintiffs Ballesteros, Bautista and Escobido with a lawsuit for breach of contract if they decided to leave, and reiterated to them that he was finalizing contracts with some New York City-based hotels.

260.     After experiencing improper payment of her wages and the non-payment of her overtime hours, the delayed release of her salaries, the non-provision of the original copies of her immigration documents, and the frequent lack of full-time work towards the end of her employment, Plaintiff Ballesteros decided to escape from Defendants' employment sometime in March 2011.

### Additional Facts as to Plaintiff BAUTISTA

261.     Defendants, through Defendant Villanueva, interviewed Plaintiff Bautista around August 2009 in the Philippines, whereby Defendant Villanueva informed Bautista about his future employment and the requirements by Defendants for the offered position.

262.     Plaintiff Bautista was required to undergo English proficiency and hotel training whereby Defendants, through their Philippine agents assessed him the amount of nine thousand (P9,000) pesos as training fee.

263.    Sometime in November 2009, Defendants, through their Philippine agents, required Plaintiff Bautista to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

264.    On November 20, 2009, Defendant's agents in the Philippines required Plaintiff Bautista to sign a Seasonal Contract with Defendant Lincoln Road Employment Services which stated that he would be employed as a housekeeper from November 2009 to October 1, 2010 at the W Hotel in Miami Beach, Florida at the gross rate of $8.28 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

265.    Plaintiff Bautista received his H-2B visa on November 23, 2009 under the sponsorship of Defendant Lincoln Road Employment Services (EAC-10-023-52000).

266.    On November 26, 2009, upon instructions by Defendants, Plaintiff Bautista left the Philippines for his employment as a housekeeper in the United States with Defendant Lincoln Road Employment Services.

267.    From December 2009 to September 2010, Defendants, through Defendant Villanueva, required Plaintiff Bautista to work as a housekeeper at the W Hotel and paid him an hourly rate of $6.00 and with no overtime pay for the first three months.  Starting on the fourth month, Plaintiff Bautista was paid by Defendants an hourly rate of $6.50.

268.    Sometime May 2010, Plaintiff Bautista and other H-2B workers learned that Defendants were planning to move their employees to work at New York City-based hotels.

269.   At the end of his work at the W Hotel and for three months thereafter, Plaintiff Bautista and Plaintiffs Ballesteros and Escobido were not given any work assignments by the Defendants, despite their making themselves available to Defendants who continued to house them and promised them employment.

270.   Upon information and belief, Defendants, using Defendant South Beach Employment Services as sponsor, filed a transfer petition (EAC-10-243-50573) of Plaintiff Bautista's H-2B status.

271.   Defendant Villanueva notified Plaintiff Bautista that the transfer petition was approved, but failed to furnish Plaintiff Bautista a copy of the approval notice with the attached renewed Form I-94 card. Defendant Villanueva however advised Plaintiff Bautista that he could continue working for the Defendants.

272.   Sometime middle of December 2010, Defendant Villanueva instructed Plaintiff Espiritu to fetch Plaintiffs Bautista, Ballesteros, and Escobido from Miami and to bring them to work in New York.

273.   However, Plaintiffs Bautista, Ballesteros, and Escobido were brought to West Palm Beach, Florida upon the instructions by Defendant Villanueva, to await further developments of the hotel contracts allegedly being finalized by Defendant Villanueva with New York City-based hotels.

274.   For about another month, no work assignments were given to Plaintiff Bautista and his co-workers Ballesteros and Escobido.

275.   Sometime January 2011, Defendant Villanueva gave Plaintiffs Bautista, Ballesteros, and Escobido part-time work assignments at Falls Country Club in West Palm Beach, Florida.

276.   Plaintiffs Bautista, Ballesteros, and Escobido thereafter demanded from Defendant Villanueva that they be repatriated to the Philippines as they could hardly support themselves with the lack of full-time employment and the measly salaries they were receiving from Defendants.

277.   Defendant Villanueva threatened Plaintiffs Bautista, Ballesteros, and Escobido with a lawsuit for breach of contract if they decided to leave, and reiterated to them that he was finalizing contracts with some New York City-based hotels.

278.   After experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, Plaintiff Bautista decided to escape from Defendants' employment sometime in March 2011.

### Additional Facts as to Plaintiff CAMPOS

279.   Defendants, through Defendant Villanueva, interviewed Plaintiff Campos sometime in November 2008 in the Philippines, whereby Defendant Villanueva informed Campos about his future employment and the requirements by Defendants for the offered position.

280.   On November 21, 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp., required Plaintiff Campos to open a

52

bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

281.   On January 26, 2009, Defendant's agents in the Philippines required Plaintiff Campos to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at Kiawah Island Club in South Carolina at the gross rate of $7.13 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

282.   Plaintiff Campos received his H-2B visa on January 28, 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

283.   On February 8, 2009, upon instructions by Defendants, Plaintiff Campos left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

284.   Upon his arrival in the United States, Plaintiff Campos was surprised to find out that there was no job as a waiter waiting for him.

285.   Defendants, through Defendant Villanueva, assigned Plaintiff Campos as a dishwasher at The Admiral's Club in Jupiter, Florida at a gross rate of $6.00 per hour, and without any overtime pay, until October 2009.

286.   Upon information and belief, Defendants, using two or more of Defendant Villanueva's companies, including Defendant South Beach Employment Services, filed extension and/or transfer petitions on behalf of Plaintiff Campos, which petitions were allegedly approved.   Upon information and belief, the transfer petition (EAC-10-243-50573) filed by Defendant South

Beach Employment Services on behalf of Plaintiff Campos was approved with validity date until April 1, 2011.

287.    Plaintiff Campos was not given original copies of the approval notices of the extension or transfer petitions. He was advised that for as long as there was a petition filed in his behalf, he could continue working for the Defendants.

288.    Defendants gave Plaintiff Campos work assignment as cocktail runner at the W Hotel in Miami Beach, Florida from June 2009 to May 2010.

289.    On May 31, 2010, Plaintiff Campos, together with seventeen other H-2B workers, including some Plaintiffs, left Florida upon the instructions by Defendants, through Defendant Villanueva, and moved to New Jersey to work as housekeepers in New York City-based hotels.

290.    On June 3, 2010, Defendant Jucilyn brought Plaintiff Campos and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

291.    On July 9, 2010, Defendant Jucilyn again brought Plaintiff Campos and seven other H-2B workers, including some Plaintiffs, to be interviewed at the Intercontinental New York Times Square Hotel.

292.    For three days, starting on August 7, 2010, Plaintiff Campos and seven other H-2B workers, including some Plaintiffs, were assigned to work as housekeepers at the Intercontinental New York Times Square Hotel. Defendant Villanueva personally endorsed the workers to the hotel management in Manhattan before they started their work as housekeepers.

293.   Upon instructions by Defendants, more particularly Defendants Villanueva and Jucilyn, Plaintiff Campos joined other H-2B workers in presenting themselves for interview at New York City-based hotels, such as the Fashion 26 Hotel.

294.   On November 3, 2010, Defendants Villanueva and Jucilyn brought Plaintiff Campos and other H-2B workers, including some Plaintiffs, to be interviewed at the Fairfield Hotel in Manhattan.

295.   Likewise upon instructions by Defendant Villanueva, Plaintiff Campos and other H-2B workers participated in a job fair in January 2011 at the Grand Central Station in Manhattan.

296.   Sometime in November 2010, Defendant Jucilyn brought several H-2B workers, including Plaintiff Campos, to Albany, New York for the latter to apply for driver's licenses.

297.   Defendant Jucilyn brought out the original Form I-94 card of Plaintiff Campos which was being required for the license application. At this point, Plaintiff Campos demanded that he keep the original copy of his Form I-94 card. Defendant Joycelyn however refused to give it to Plaintiff Campos and immediately took it back from Plaintiff Campos after the latter's license application.

298.   Sometime in March 2011, Plaintiff Campos, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work during the latter period of

his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

## Additional Facts as to Plaintiff DE LUNA

299.   Defendants, through Defendant Villanueva, interviewed Plaintiff De Luna sometime in September 2007 in the Philippines, whereby Defendant Villanueva informed De Luna about his future employment and the requirements by Defendants for the offered position.

300.   Sometime in September 2007, Defendant's agents in the Philippines required Plaintiff De Luna to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a cook at The Admiral's Club in Jupiter, FL, at the gross rate of $7.91 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

301.   Sometime in November 2007, Defendants, through their Philippine agents, Eurasiam Quest, required Plaintiff De Luna to open a bank account whereby he was made to deposit the amount of fifty thousand (P50,000) pesos to serve as his security bond.

302.   Plaintiff De Luna received his H-2B visa on November 19, 2007 under the sponsorship of Defendant San Villa Management (EAC-07-212-52708).

303.   On December 4, 2007, upon instructions by Defendants, Plaintiff De Luna left the Philippines for his employment as a cook in the United States with Defendant San Villa Management.

304.    Instead of assigning him as a cook at The Admiral's Club, Defendants, through Defendant Villanueva, required Plaintiff De Luna to work as a pool attendant for two months at a gross rate of $7.00 per hour.

305.    Thereafter, Defendant Villanueva transported Plaintiff De Luna to Miami, Florida, where he required him to work as a line-cook at the Quattro Restaurant at an hourly rate of $7.50 and with no overtime pay, for about twenty months.

306.    From November 2009 to April 2010, Defendants, through Defendant Villanueva, transferred Plaintiff De Luna to work as a salad station preparer at the W Hotel in Miami Beach, Florida.

307.    On May 31, 2010, Plaintiff De Luna, together with seventeen other H-2B workers, including some Plaintiffs, left Florida upon instructions by Defendants, through Defendant Villanueva, and moved to New Jersey to work as housekeepers in New York City-based hotels.

308.    On June 3, 2010, Defendant Jucilyn brought Plaintiff De Luna and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

309.    On July 9, 2010, Defendant Jucilyn again brought Defendant De Luna and seven other H-2B workers, including some Plaintiffs, to be interviewed at the Intercontinental New York Times Square Hotel.

310.    Defendant De Luna, together with seven other H-2B workers, started working as housekeepers at the Intercontinental New York Times Square

Hotel on August 7, 2010. They worked for only three days with said hotel, until August 11, 2010.

311.    On the night of August 11, 2010, Defendant Villanueva advised Plaintiff De Luna and Plaintiff Almilla that there were openings for the position of line cook at the Trump Soho Hotel in downtown Manhattan.

312.    After the initial interviews, Plaintiff De Luna and Almilla began their orientation at the Trump Soho Hotel.

313.    However, due to the inability of Defendants, particularly Defendant Villanueva, to provide the current Form I-94 cards of Plaintiffs De Luna and Almilla, Trump Soho Hotel terminated their services on August 22, 2010.

314.    Plaintiff De Luna waited for the next work assignment to be given to him by Defendants, and after several months, Defendants transported Defendant Luna back to Florida to work as a cook or salad preparer at The Falls Club in West Palm Beach, at an hourly rate of $7.50, until May 11, 2011.

315.    Defendants did not compensate Plaintiff De Luna for his last month of service, the period from April to May 11, 2011.

316.    Upon information and belief, Defendant San Villa extended three times the H-2B status of Plaintiff De Luna, and which three petitions (EAC-08-150-53104; EAC-08-256-51961; and; EAC-09-158-52077) were approved with validity period ending on October 1, 2009.

317. Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services as sponsor, filed a transfer petition (EAC-10-035-51367) of Plaintiff's H-2B status.

318. When Plaintiff De Luna inquired as to the status of the H-2B transfer petition, Defendant Villanueva replied by stating that the petition was still pending, and that in the meantime Plaintiff De Luna could legally continue working.

319. Defendant Villanueva reiterated to Plaintiff De Luna that his papers were still being processed by the Immigration Service and that he did not have to worry about his immigration status.

320. Plaintiff De Luna made himself available to work for Defendants during the whole time that he, together with other H-2B workers from Florida, was waiting for assignments while residing at the New Jersey housing facilities rented by Defendants for them.

321. On June 2, 2011, Plaintiff De Luna, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

## Additional Facts as to Plaintiff ESCOBIDO

322. Defendants, through Defendant Villanueva, interviewed Plaintiff Escobido in September 2009 in the Philippines, whereby Defendant Villanueva

informed Escobido about his future employment and the requirements by Defendants for the offered position.

323.    Plaintiff Escobido was required to undergo English proficiency and hotel training whereby Defendants, through their Philippine agents, San Villa Manpower Agency Corp., assessed him the amount of nine thousand (P9,000) pesos as training fee.

324.    Sometime in November 2009, Defendants, through their Philippine agents, required Plaintiff Escobido to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

325.    On November 18, 2009, Defendant's agents in the Philippines required Plaintiff Escobido to sign a Seasonal Contract with Defendant Lincoln Road Employment Services which stated that he would be employed as a housekeeper from November 2009 to October 1, 2010 at the W Hotel in Miami Beach, Florida at the gross rate of $8.28 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

326.    Plaintiff Escobido received his H-2B visa on November 23, 2009 under the sponsorship of Defendant Lincoln Road Employment Services (EAC-10-023-52000).

327.    On November 26, 2009, upon instructions by Defendants, Plaintiff Escobido left the Philippines for his employment as a housekeeper in the United States with Defendant Lincoln Road Employment Services.

328.    From late November 2009 to September 2010, Defendants, through Defendant Villanueva, required Plaintiff Escobido to work as a

housekeeper at the W Hotel and paid him an hourly rate of $6.00 and with no overtime pay for the first three months. Starting on the fourth month, Plaintiff Escobido was paid by Defendants an hourly rate of $6.50.

329. Sometime May 2010, Plaintiff Escobido and other H-2B workers learned that Defendants were planning to move their employees to work at New York City-based hotels.

330. At the end of his work at the W Hotel and for three months thereafter, Plaintiff Escobido and Plaintiffs Bautista and Ballesteros were not given any work assignments by the Defendants, despite their making themselves available to Defendants who continued to house them and promised them employment.

331. Upon information and belief, Defendants, using Defendant South Beach Employment Services as sponsor, filed a transfer petition (EAC-10-243-50573) of Plaintiff Escobido's H-2B status.

332. Defendant Villanueva notified Plaintiff Escobido that the transfer petition was approved, but failed to furnish Plaintiff Escobido a copy of the approval notice with the attached renewed Form I-94 card. Defendant Villanueva however advised Plaintiff Escobido that he could continue working for the Defendants.

333. Sometime middle of December 2010, Defendant Villanueva instructed Plaintiff Espiritu to fetch Plaintiffs Escobido, Ballesteros and Bautista from Miami and to bring them to work in New York.

334.   However, Plaintiffs Escobido, Ballesteros and Bautista were brought to West Palm Beach, Florida upon instructions by Defendant Villanueva, to await further developments of the hotel contracts being allegedly finalized by Defendant Villanueva with New York City-based hotels.

335.   For about another month, no work assignments were given to Plaintiff Escobido and his co-workers Bautista and Ballesteros.

336.   Sometime January 2011, Defendant Villanueva gave Plaintiffs Escobido, Bautista and Ballesteros part-time work assignments at Falls Country Club in West Palm Beach, Florida.

337.   Plaintiffs Escobido, Bautista and Ballesteros thereafter demanded from Defendant Villanueva that they be repatriated to the Philippines as they could hardly support themselves with the lack of full-time employment and the measly salaries they were receiving from Defendants.

338.   Defendant Villanueva threatened Plaintiffs Escobido, Bautista and Ballesteros with a lawsuit for breach of contract if they decided to leave, and reiterated to them that he was finalizing contracts with some New York City-based hotels.

339.   After experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the frequent lack of full-time work towards the end of his employment, Plaintiff Escobido decided to escape from Defendants' employment sometime in March 2011.

### Additional Facts as to Plaintiff GADICHO

340.    Defendants, through Defendant Villanueva, interviewed Plaintiff Gadicho approximately around November 2008 in the Philippines, whereby Defendant Villanueva informed Gadicho about his future employment and the requirements by Defendants for the offered position.

341.    Plaintiff Gadicho was required to undergo English proficiency and fine dining service training whereby Defendants, through their Philippine agents assessed him the amount of nine thousand (P9,000) pesos as training fee.

342.    Sometime in February 2009, Defendants, through their Philippine agents, required Plaintiff Gadicho to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security deposit.

343.    On February 24, 2009, Defendant's agents in the Philippines required Plaintiff Gadicho to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter from April 2009 to October 2009 at Kiawah Island Golf Resort in South Carolina, at the gross rate of $7.13 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

344.    Plaintiff Gadicho received his H-2B visa on February 27, 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

345.    On March 7, 2009, upon instructions by Defendants, Plaintiff Gadicho left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

346. Starting April 2009 until September 2009. Defendants. through Defendant Villanueva. required Plaintiff Gadicho to work as a pool attendant at the Kiawah Island Golf Resort. at an hourly rate of $6.00 and with no overtime pay.

347. Defendants thereafter transported Plaintiff Alberto to Miami, Florida where he was assigned to work as a housekeeper until May 2010 at the W Hotel earning $6.50 per hour.

348. Upon information and belief. Defendants. using Defendant Lincoln Road Employment Services as sponsor. filed a transfer petition of Plaintiff Gadicho's H-2B status. which petition was allegedly denied.

349. Defendant Villanueva advised Plaintiff Gadicho and other H-2B workers during a general staff meeting that denials of H-2B petitions could be appealed on three different levels. and that while an appeal was pending. the beneficiary could continue working for the petitioning employer.

350. Defendant Villanueva confirmed during the general staff meeting that the denied H-2B petition involving several H-2B employees. including Plaintiff Gadicho. was appealed and was thus "in process".

351. On May 31, 2010. Plaintiff Gadicho, together with seventeen other H-2B workers. including some Plaintiffs. left Florida upon instructions by Defendants, through Defendant Villanueva. and moved to New Jersey to work in New York City-based hotels.

352.   On June 3, 2010, Defendant Jucilyn brought Plaintiff Gadicho and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

353.   On November 3, 2010, Defendants Villanueva and Joycelyn brought Plaintiff Gadicho and other H-2B workers, including Plaintiffs Antonio, Que, Campos and Delgado, to the Fairfield Hotel at 28th Street in Manhattan for job interview.   However, the interview did not materialize as Defendant Villanueva and the hotel's General Manager could not agree on the compensation rates for the workers' services.

354.   After experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, Plaintiff Gadicho  decided to escape from Defendants' employment sometime in March 2011.

**Additional Facts as to Plaintiff NIPALES**

355.   Defendants, through Defendant Villanueva, interviewed Plaintiff Nipales approximately around August 2008 in the Philippines, whereby Defendant Villanueva informed Nipales about his future employment and the requirements by Defendants for the offered position.

356.   Plaintiff Nipales was required to undergo English proficiency and hotel training whereby Defendants, through their Philippine agents, assessed him the amount of nine thousand (P9,000) pesos as training fee.

357.   Sometime approximately around April 2009, Defendants, through their Philippine agents, required Plaintiff Nipales to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

358.   Sometime around April 2009, Defendant's agents in the Philippines required Plaintiff Nipales to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at the Kiawah Island Club in South Carolina at the gross rate of $7.13 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

359.   Plaintiff Nipales received his H-2B visa on April 24, 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

360.   On May 18, 2009, upon instructions by Defendants, Plaintiff Nipales left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

361.   Plaintiff Nipales was surprised to find out that there was no job waiting for him upon his arrival.  It was only about a month after his arrival when Defendants, through Defendant Villanueva, assigned him to work at the W Hotel in Miami Beach, Florida as a food runner and cocktail runner with an hourly rate of $6.00, and without any overtime pay.

362.   In October 2010, Defendants pulled out Plaintiff Nipales from the W Hotel and moved him to West Palm Beach, Florida, where he was assigned to work as an on-call waiter at the Falls Country Club on a very part-time basis.

66

363.   Plaintiff Nipales complained to Defendants about his irregular, part-time work, but Defendant Villanueva asked him to be more patient as he was allegedly finalizing his contracts with New York hotels where he intended to assign Plaintiff Nipales and other H-2B workers.

364.   Defendants did not pay Plaintiff Nipales' wages from February 2011 to March 2011.

365.   Upon information and belief, Defendants, using one or two of Defendant Villanueva's companies, were able to extend and/or transfer the H-2B status of Plaintiff Nipales, but Plaintiff Nipales was not given any copy of said approval notices or even notified about the results of said petitions.

366.   After experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, Plaintiff Nipales decided to escape from Defendants' employment sometime in March 2011.

### Additional Facts as to Plaintiff QUE

367.   Defendants, through Defendant Villanueva, interviewed Plaintiff Que sometime in September 2007 in the Philippines, whereby Defendant Villanueva informed Que about his future employment and the requirements by Defendants for the offered position.

368.   Sometime in November 2007, Defendants, through their Philippine agents, Euroasiam Quest, required Plaintiff Que to open a bank account whereby

he was made to deposit the amount of fifty thousand (P50,000) pesos as security bond.

369.    In November 2007, Defendant's agents in the Philippines required Plaintiff Que to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at The Admiral's Club in Jupiter, Florida at the gross rate of $6.67 per hour.   The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

370.    Plaintiff Que received his H-2B visa on November 20, 2007 under the sponsorship of Defendant San Villa Management (EAC-07-212-52666).

371.    On December 11, 2007, upon instructions by Defendants, Plaintiff Que left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

372.    Upon his arrival in the United States, Plaintiff Que was surprised to find out that there was no job as a waiter waiting for him.  Instead, Defendants assigned him as a dish washer or steward at The Admiral's Club in Jupiter, FL, until March 2008 at the hourly rate of $6.00 per hour, and with no overtime pay.

373.    Upon information and belief, Defendant San Villa Management filed a petition (EAC-08-143-53179) to extend Plaintiff Que's H-2B status, which petition was allegedly approved with validity period until October 31, 2008.

374.    Upon information and belief, Defendant Villanueva used one or two of his several companies to extend and/or transfer the H-2B status of Plaintiff Que.  Plaintiff Que was not given notices of whatever happened to those petitions, but was told that he could continue working for the Defendants.

375.    From April 2008 to September 2009, Defendants failed to provide any employment to Plaintiff Que despite the latter's making himself available to Defendants and Defendants having control and supervision over his person, time, and activities.

376.    From October 2009 to March 2010, Defendants assigned Plaintiff Que to work as steward again at The Admiral's Club.

377.    Defendants thereafter transferred Plaintiff Que's assignment to the W Hotel in Miami Beach, FL as an assistant baker and housekeeper for a period of two months.

378.    On May 31, 2010, Plaintiff Que, together with seventeen other H-2B workers, including some Plaintiffs, left Florida upon instructions by Defendants, through Defendant Villanueva, and moved to New Jersey to work as housekeepers in New York City-based hotels.

379.    On June 3, 2010, Defendant Jucilyn brought Plaintiff Que and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

380.    On July 9, 2010, Defendant Jucilyn again brought Plaintiff Que and seven other H-2B workers, including some Plaintiffs, to be interviewed at the Intercontinental New York Times Square Hotel.

381.    On November 3, 2010, Plaintiff Que and several other H-2B workers were accompanied by Defendant Villanueva supposedly to be interviewed at the Fairfield Hotel in Manhattan.

382.    Upon instructions by Defendants, more particularly Defendants Villanueva and Jucilyn, Plaintiff Que joined other H-2B workers in presenting themselves for interview at New York City-based hotels, such as the Fashion 26 Hotel.

383.    Likewise upon instructions by Defendant Villanueva, Plaintiff Que and other H-2B workers participated in a job fair in January 2011 at the Grand Central Station in Manhattan.

384.    On March 28, 2011, Plaintiff Que, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work during the majority period of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

### Additional Facts as to Plaintiff SANICO

385.    Defendants, through Defendant Villanueva, interviewed Plaintiff Sanico approximately sometime October 2008 in the Philippines, whereby Defendant Villanueva informed Sanico about his future employment and the requirements by Defendants for the offered position.

386.    Sometime in December 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp., required Plaintiff Sanico to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security bond.

70

387.   On December 15, 2008, Defendant's agents in the Philippines required Plaintiff Sanico to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at Kiawah Island Club in South Carolina at the gross rate of $7.13 per hour. The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

388.   Plaintiff Sanico received his H-2B visa on January 30, 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

389.   On February 17, 2009, upon instructions by Defendants, Plaintiff Sanico left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

390.   Upon his arrival in the United States, Plaintiff Sanico was surprised to find out that there was no job as a waiter waiting for him. He was not given any work assignments for more than a month.

391.   From April 2009 to September 2009, Defendants gave work assignment to Plaintiff Sanico for the position of pool attendant at the Kiawah Island Golf Resort in South Carolina at an hourly wage of $6.00 and with no overtime pay.

392.   From October 2009 to May 2010, Defendants assigned Plaintiff Sanico to work as a housekeeper at the W Hotel in Miami Beach, Florida.

393.   Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services, filed a transfer petition (EAC-10-025-51629) to

extend Plaintiff Sanico's H-2B status, which petition was allegedly approved with validity period until April 1, 2010.

394.    Upon information and belief, Defendant Villanueva used one or two of his several companies to extend and/or transfer the H-2B status of Plaintiff Sanico.  Plaintiff Sanico was not given notices of whatever happened to those petitions, but was told that he could continue working for the Defendants.

395.    On May 31, 2010, Plaintiff Sanico, together with seventeen other H-2B workers, including some Plaintiffs, left Florida upon instructions by Defendants, through Defendant Villanueva, and moved to New Jersey to work as housekeepers in New York City-based hotels.

396.    On June 3, 2010, Defendant Jucilyn brought Plaintiff Sanico and several H-2B workers, including some Plaintiffs, to the Holiday Inn Express in Manhattan for possible job interview.

397.    On July 9, 2010, Defendant Jucilyn again brought Plaintiff Sanico and seven other H-2B workers, including some Plaintiffs, to be interviewed at the Intercontinental New York Times Square Hotel.

398.    For three days, starting on August 7, 2010, Plaintiff Sanico and seven other H-2B workers, including some Plaintiffs, were assigned to work as housekeepers at the Intercontinental New York Times Square Hotel.

399.    Upon instructions by Defendants, more particularly Defendants Villanueva and Jucilyn, Plaintiff Sanico joined other H-2B workers in presenting themselves for interview at New York City-based hotels, such as the Fashion 26 Hotel.

400.   Likewise upon instructions by Defendant Villanueva, Plaintiff Sanico and other H-2B workers participated in a job fair in January 2011 at the Grand Central Station in Manhattan.

401.   In March 2011, Plaintiff Sanico, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work during the majority period of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers

### Additional Facts as to Plaintiff SARMIENTO

402.   Defendants, through Defendant Villanueva, interviewed Plaintiff Sarmiento sometime in December 2008 in the Philippines, whereby Defendant Villanueva informed Sarmiento about his future employment and the requirements by Defendants for the offered position.

403.   On December 22, 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp., required Plaintiff Sarmiento to open a bank account whereby he was made to deposit the amount of one hundred thousand (P100,000) pesos as security deposit.

404.   On or about January 26, 2009, Defendant's agents in the Philippines required Plaintiff Sarmiento to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at Kiawah Island Club in South Carolina at the gross rate of $7.13 per

hour.  The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

405.    Plaintiff Sarmiento received his H-2B visa sometime in January 2009 under the sponsorship of Defendant San Villa (EAC-09-037-5 891).

406.    On February 10, 2009, upon instructions by Defendants, Plaintiff Sarmiento left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

407.    Upon his arrival in the United States, Plaintiff Sarmiento was surprised to find out that there was no job as a waiter waiting for him.  Instead, he was assigned to work as a server at The Admiral's Club in Jupiter, Florida, until April 2009, and was compensated only $6.00 per hour, with no overtime pay.

408.    In April 2009, Defendants transported Plaintiff Sarmiento to South Carolina to work as an assistant server at the Kiwah Island Golf Resort.  Plaintiff worked at said resort until September 2009 with an hourly wage of $6.00.

409.    From October 2009 to January 2010, Defendants assigned Plaintiff to work at The Falls Country Club in West Palm Beach, Florida as a server with an hourly wage of $6.00.

410.    Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services, filed a transfer petition (EAC-10-025-51629) to extend Plaintiff Sarmiento's H-2B status.

411.    On January 16, 2010, Plaintiff Sarmiento, together with Plaintiff Sibayan, went to visit a friend in Miami, Florida.  While in Miami, they were

accosted by immigration and border patrol agents who demanded proof of their valid immigration status.

412.   Plaintiff Sarmiento and Sibayan admitted that their original Form I-94 cards had expired but mentioned that their employers, Defendants Villanueva and San Villa Management, had filed a transfer petition on their behalf through Defendant Lincoln Road Employment Services.   The immigration and border patrol agents, however, told Plaintiffs Sarmiento and Sibayan that the transfer petition was not timely filed, and thus, they were unlawfully present.   They were put in removal proceedings and were detained in an immigration detention center.

413.   While in immigration detention, Plaintiffs Sarmiento and Sibayan were visited by Defendant Villanueva, who was accompanied by his girl friend, Nenita Giessmann, a U.S.C.I.S. officer herself.   Defendant Villanueva promised Plaintiffs Sarmiento and Sibayan that he would provide a lawyer to work on their bail applications.

414.   After they secured their temporary liberty, Plaintiffs Sarmiento and Sibayan were housed by Defendants, particularly Defendant Villanueva, but were not given any job assignments until sometime in April 2010, when Defendant Villanueva assigned Plaintiff Sarmiento to work again as an assistant server at the Kiawah Island Golf Resort in South Carolina.

415.   Defendants, through Defendant Villanueva, advised Plaintiff Sarmiento that they would eventually transfer Plaintiffs Sarmiento and Sibayan to work as housekeepers in New York City hotels.

416.   Defendants, through Defendant Villanueva, did not pay Plaintiff Sarmiento his wages for the months of May and June 2010, as Defendant Villanueva allegedly reimbursed himself for his legal expenses in securing Plaintiff Sarmiento's bail application.

417.   Plaintiff Sarmiento made himself available to work for Defendants, and waited to be transported to New York, but no other job assignment was given to Plaintiff Sarmiento after June 2010.

418.   Sometime in October 2010, Plaintiff Sarmiento, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work towards the end of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

### Additional Facts as to Plaintiff SIBAYAN

419.   Defendants, through Defendant Villanueva, interviewed Plaintiff Sibayan sometime in December 2008 in the Philippines, whereby Defendant Villanueva informed Sibayan about her future employment and the requirements by Defendants for the offered position.

420.   On December 22, 2008, Defendants, through their Philippine agents, San Villa Manpower Agency Corp., required Plaintiff Sibayan to open a bank account whereby she was made to deposit the amount of one hundred thousand (P100,000) pesos as security deposit.

421.   On or about January 26, 2009, Defendant's agents in the Philippines required Plaintiff Sibayan to sign a Seasonal Contract with Defendant San Villa Management which stated that she would be employed as a waitress at Kiawah Island Club in South Carolina at the gross rate of $7.13 per hour.  The Agreement likewise provided that she would be provided employment five days or 40 hours per week.

422.   Plaintiff Sibayan received her H-2B visa sometime in January 2009 under the sponsorship of Defendant San Villa Management (EAC-09-037-51891).

423.   On February 10, 2009, upon instructions by Defendants, Plaintiff Sibayan left the Philippines for her employment as a waitress in the United States with Defendant San Villa Management.

424.   Upon her arrival in the United States, Plaintiff Sibayan was surprised to find out that there was no job as a waitress waiting for her.  Instead, she was assigned to work as a server at The Admiral's Club in Jupiter, Florida, until April 2009, and was compensated only $6.00 per hour, with no overtime pay.

425.   In April 2009, Defendants transported Plaintiff Sibayan to South Carolina to work as a pool attendant at the Kiwah Island Golf Resort.  Plaintiff worked at said resort until September 2009 with an hourly wage of $6.00.

426.   From October 2009 to January 2010, Defendants assigned Plaintiff to work at The Falls Country Club in West Palm Beach, Florida as a server with an hourly wage of $6.00.

427.    Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services, filed a transfer petition (EAC-10-025-51629) to extend Plaintiff Sibayan's H-2B status.

428.    On January 16, 2010, Plaintiff Sibayan, together with Plaintiff Sarmiento, went to visit a friend in Miami, Florida.  While in Miami, they were accosted by immigration and border patrol agents who demanded proof of their valid immigration status.

429.    Plaintiffs Sibayan and Sarmiento admitted that their original Form I-94 cards had expired but mentioned that their employers, Defendants Villanueva and San Villa, had filed a transfer petition on their behalf through Defendant Lincoln Road Employment Services.  The immigration and border patrol agents, however, told Plaintiffs Sarmiento and Sibayan that the transfer petition was not timely filed, and thus, they were unlawfully present.  They were put in removal proceedings and were detained in an immigration detention center.

430.    While in immigration detention, Plaintiffs Sibayan and Sarmiento were visited by Defendant Villanueva, who was accompanied by his girlfriend, Nenita Giessmann, a U.S.C.I.S. officer herself.  Defendant Villanueva promised Plaintiffs Sibayan and Sarmiento that he would provide a lawyer to work on their bail applications.

431.    After they secured their temporary liberty, Plaintiffs Sibayan and Sarmiento were given housing accommodations by Defendants, particularly Defendant Villanueva, but were not given any job assignments until sometime in

April 2010, when Defendant Villanueva assigned Plaintiff Sibayan to work again as a pool attendant at the Kiawah Island Golf Resort in South Carolina.

432. Defendants, through Defendant Villanueva, advised Plaintiff Sibayan that they would eventually transfer Plaintiffs Sibayan and Sarmiento to work as housekeepers in New York City hotels.

433. Defendants, through Defendant Villanueva, did not pay Plaintiff Sibayan her wages for the months of May and June 2010, as Defendant Villanueva allegedly reimbursed himself for his legal expenses in securing Plaintiff Sibayan's bail application.

434. Plaintiff Sibayan made herself available to work for Defendants, and waited to be transported to New York, but no other job assignment was given to Plaintiff Sibayan after June 2010.

435. Sometime in October 2010, Plaintiff Sibayan, after experiencing improper payment of her wages and the non-payment of her overtime hours, the delayed release of her salaries, the non-provision of the original copies of her immigration documents, and the lack of full-time work towards the end of her employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for her and other H-2B workers.

**Additional Facts as to Plaintiff YUSON**

436. Defendants, through Defendant Villanueva, interviewed Plaintiff Yuson sometime in June 2007 in the Philippines, whereby Defendant Villanueva informed Yuson about his future employment and the requirements by Defendants for the offered position.

437.   On August 24, 2007, Defendant's agents in the Philippines required Plaintiff Yuson to sign a Seasonal Contract with Defendant San Villa Management which stated that he would be employed as a waiter at Bocaire Country Club in Palm Beach County, Florida at the gross rate of $6.67 per hour. The Agreement likewise provided that he would be provided employment five days or 40 hours per week.

438.   Plaintiff Yuson received his H-2B visa on November 29, 2007 under the sponsorship of Defendant San Villa Management (EAC-07-212-52666).

439.   Sometime in December 2007, Defendants, through their Philippine agents, required Plaintiff Yuson to open a bank account whereby he was made to deposit the amount of fifty thousand (P50,000) pesos as security deposit.

440.   On December 8, 2007, upon instructions by Defendants, Plaintiff Yuson left the Philippines for his employment as a waiter in the United States with Defendant San Villa Management.

441.   Upon his arrival in the United States, Plaintiff Que was surprised to find out that there was no job as a waiter waiting for him. Instead, Defendants assigned him to work as a dish washer or steward at The Admiral's Club in Jupiter, Florida, until March 2008 at the hourly rate of $6.00 per hour, and with no overtime pay.

442.   Upon information and belief, Defendant San Villa filed two petitions (EAC-08-143-53179 and EAC-08-248-51479)) to extend Plaintiff Que's H-2B status, which petitions were allegedly approved with validity periods until October 31, 2008 and May 12, 2009, respectively.

443.     Upon information and belief, Defendants, using Defendant Lincoln Road Employment Services as sponsor, filed a transfer petition (EAC-10-035-51367) to extend Plaintiff's H-2B status, which petition was allegedly approved with validity date until April 1, 2010.

444.     Upon information and belief, Defendant Lincoln Road Employment Services extended the H-2B status of Plaintiff by filing two more petitions, both of which were allegedly approved with validity period until April 1, 2011 (EAC-10-243-50593).

445.     Plaintiff Yuson was not given original copies of the approval notices referred to above, but was told by Defendant Villanueva that he could continue working for the Defendants.

446.     From May 2008 to October 2008, Defendants assigned Plaintiff Yuson at the Kiawah Island Club in South Carolina as a pool attendant with an hourly wage of $6.50 and with no overtime pay.

447.     From November 2008 to May 2009, Defendants assigned Plaintiff Yuson at The Admiral's Club in Jupiter, Florida as a dish washer with an hourly wage of $7.00.

448.     From May 2009 to September 2009, Defendants assigned Plaintiff Yuson at the Kiawah Island Club as a pool attendant.

449.     For one year starting in October 2009, Defendants assigned Plaintiff Yuson at the W Hotel in Miami Beach, Florida as a housekeeper with an hourly wage of $7.00.

450.    Defendants were unable to give Plaintiff Yuson any work assignment from October 2, 2010 through October 15, 2010.

451.    Starting on October 16, 2010, Defendants assigned Plaintiff Yuson to work as a food runner at the W Hotel on a part-time, irregular basis.

452.    Defendant Villanueva advised Plaintiff Yuson that he would be transporting him and other H-2B workers from Florida to work as housekeepers in New York City hotels.   This plan, however, did not materialize, even as Defendants failed to pay the rents for the apartment they provided to Plaintiff Yuson and other H-2B workers.

453.    In March 2011, Plaintiff Yuson, after experiencing improper payment of his wages and the non-payment of his overtime hours, the delayed release of his salaries, the non-provision of the original copies of his immigration documents, and the lack of full-time work during the latter part of his employment, decided to escape from Defendants' employment and left the housing facility that Defendants had provided for him and other H-2B workers.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Trafficking Victims Protection Act of 2003 ("TVPA")

Forced Labor, 18 U.S.C. §1589

454.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 453 as if set forth fully herein.

455.    Plaintiffs bring this claim against all the Defendants.

456.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

457.    Defendants subjected Plaintiffs to forced labor in violation of 18 U.S.C. §1589.

458.    Defendants knowingly provided and obtained Plaintiffs' labor and services by subjecting Plaintiffs to threats of serious harm of themselves and others, including litigation, blacklisting by the Philippine and U.S. governments, arrest, detention, deportation by immigration and law enforcement officials, loss of immigration status, and physical harm in the Philippines, in violation of 18 U.S.C. §1589(2).

459.    By threatening Plaintiffs with litigation, blacklisting by the U.S. and Philippine governments, arrest, detention, deportation by immigration and law enforcement officials, deceiving Plaintiffs about the terms of their visas and Defendants' intent and ability to acquire future visas, and withholding Plaintiffs' immigration documents, Defendants provided and obtained the labor of Plaintiffs through abuse and threatened abuse of law and the legal process in violation of 18 U.S.C. §1589(3).

460.    Defendants knowingly provided and obtained Plaintiffs' labor and services by using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they left Defendants' employ, they or another person would suffer serious harm or physical restraint, in violation of 18 U.S.C. §1589(4).

461.    As a result of the above violations, Plaintiffs suffered damages.

462.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## SECOND CAUSE OF ACTION

Trafficking Victims Protection Act of 2003 ("TVPA")

Human Trafficking, 18 U.S.C. §1590

463.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 462 as if set forth fully herein.

464.   Plaintiffs bring this claim against all the Defendants.

465.   This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

466.   Defendants knowingly recruited, harbored, and transported Plaintiffs for the purposes of subjecting them to forced labor in violation of 18 U.S.C. §1590.

467.   Defendants recruited Plaintiffs from within the Philippines, housed them in Defendant-controlled housing, and transported them throughout Florida, South Carolina, New Jersey and New York, for the purposes of subjecting them to forced labor.

468.   As a result of the above violations, Plaintiffs suffered damages.

469.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## THIRD CAUSE OF ACTION

Alien Tort Statute ("ATS")

28 U.S.C. §1350

Involuntary Servitude and Forced Labor

470.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 469 as if set forth fully herein.

471.   Plaintiffs, who are all aliens, bring this claim against all the Defendants.

472.   This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. §1350.

473.   Defendants subjected Plaintiffs to involuntary servitude and/or forced labor, which are violations of the law of nations, including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

474.   The Convention Concerning Forced or Compulsory Labor defines forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which said person has not offered himself voluntarily."

475.   The above-named Defendants engaged in acts including, but not limited to, manipulation of legal documents, psychological coercion, abuse and threatened abuse of the legal process, and threats of physical force to exact work or service from the Plaintiffs which the Plaintiffs had not offered voluntarily.

476.   Aiding and abetting involuntary servitude and forced labor is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. §1350.

477.   Defendants Melgarejo and Jucilyn, at the very least, aided and abetted the imposition of involuntary servitude and/or forced labor by directing, ordering, conspiring to commit, or aiding the imposition of involuntary servitude and/or forced labor.

478.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

## FOURTH CAUSE OF ACTION

Alien Tort Statute ("ATS")

28 U.S.C. §1350

Human Trafficking

479.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 478 as if set forth fully herein.

480.   Plaintiffs, who are all aliens, bring this claim against all the Defendants.

481.   This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. §1350.

482.   Defendants engaged in human trafficking, which is a violation of the law of nations, including customary international law as reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities

483.   The leading international instrument on the subject defines human trafficking as:

> [T]he recruitment, transportation, transfer, harboring, or receipt of persons by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. (The Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention Against Transnational Crime, art 1, Nov. 15, 2003, 55 U.N. GAOR Supp (No. 49) at 60, U.N. Doc. A/45/49 (Vol I) (2001) 40 I.L.M. 355.)

484.   Defendants engaged in acts including, but not limited to, the recruitment, transportation, transfer, harboring, or receipt of Plaintiffs. These acts were conducted through the use of the threat of force, coercion, fraud, deception, and the abuse of power and/or a position of vulnerability.

485.   Defendants trafficked Plaintiffs for the purposes of obtaining forced labor or services.

486.   Aiding and abetting human trafficking is also in violation of the law of nations and treaties of the United States, and is actionable under the Alien Tort Statute, 28 U.S.C. §1350.

487.   Defendants Melgarejo and Jucilyn, at the very least, aided and abetted human trafficking by directing, ordering, conspiring to commit, or aiding human trafficking.

488.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

## FIFTH CAUSE OF ACTION

Racketeer Influenced and Corrupt Organizations Act

18 U.S.C. §1962(c) and 18 U.S.C. §1962(d)

489.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 488 as if set forth fully herein.

490.    Plaintiffs bring this claim against all the Defendants.

491.    Plaintiffs bring this action pursuant to 18 U.S.C. §1964(c).

492.    Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §1964(c).

493.    Eurasiam Quest, San Villa Manpower Agency Corp. and Defendants Villanueva, San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Melgarejo and Jucilyn constitute an association-in-fact, and therefore constitute an enterprise (the "RICO Enterprise") within the meaning of 18 U.S.C. §1961(4).

**The RICO Enterprise**

494.    The RICO Enterprise is a business relationship between Eurasiam Quest, San Villa Manpower Agency Corp. and Defendants Villanueva, Melgarejo, Jucilyn, San Villa Management, Lincoln Road Employment Services and South Beach Employment Services, with the common purpose to profit by recruiting, obtaining, processing and providing consistent low-cost labor of Filipino H-2B guest workers to work in the United States.

495.    The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to recruiting, obtaining, processing and providing a consistent, low-cost Filipino workforce for San Villa Group

Defendants involved the international and interstate movement of workers which affects interstate commerce, state and international borders, and frequently requires travel and communications across state and international lines.

496.   San Villa Group Defendants partnered with Eurasiam Quest and San Villa Manpower Agency Corp., both labor recruitment and training companies located in the Philippines, to serve as their agents and to recruit workers in the Philippines.

497.   Defendant Villanueva, who was an agent, officer and employee of San Villa Group Defendants, traveled to the Philippines to assist Eurasiam Quest and San Villa Manpower Agency Corp. in securing workers and their visas.

498.   Once recruits were selected by San Villa Group Defendants, upon information and belief, Eurasiam Quest and San Villa Manpower Agency Corp. facilitated their visa and hiring process in the Philippines.

499.   When the Filipino guest workers, including Plaintiffs, arrived in the United States, they were placed in jobs, housed, transported and paid by San Villa Group Defendants.

500.   Defendants Villanueva, Melgarejo and Jucilyn primarily supervised, directed and controlled the workers' daily activities.

501.   Upon information and belief, Defendant Villanueva oversaw the functioning of Defendants Melgarejo and Jucilyn and the San Villa Group Defendant-companies.

## RICO Defendants' Roles in the Enterprise

502.   Defendant San Villa Management is the company that designated either Eurasiam Quest or San Villa Manpower Agency Corp. as its agent in the Philippines, applied for visas, recruited, employed and paid Filipino guest workers, and, upon information and belief, entered into contracts with the country clubs and hotels where the guest workers were placed.  Upon information and belief, Defendant San Villa Management also employed Defendants Villanueva, Melgarejo and Jucilyn.

503.   Defendant Lincoln Road Employment Services is also a company that designated either Eurasiam Quest or San Villa Manpower Agency Corp. as its agent in the Philippines, applied for visas, recruited, employed and paid Filipino guest workers, and, upon information and belief, entered into contracts with the country clubs and hotels where the guest workers were placed.  Upon information and belief, Defendant Lincoln Road Employment Services also employed Defendants Villanueva, Melgarejo and Jucilyn.

504.   Defendant South Beach Employment Services is the company that recruited, employed, and paid Filipino guest workers and entered into contracts with the country clubs and hotels where the guest workers were placed.  Upon information and belief, Defendant South Beach Employment Services also employed Defendants Villanueva, Melgarejo and Jucilyn.

505.   Defendant Villanueva facilitated recruitment and placement of guest workers and helped supervise guest workers in the United States.

a.   Defendant Villanueva communicated with either Eurasian Quest or San Villa Manpower Agency Corp. to coordinate and facilitate the recruitment of guest workers.

b.   He directly recruited, interviewed, and offered employment to the workers in the Philippines.

c.   In the United States, upon information and belief, Defendant Villanueva participated in securing contracts with country clubs and hotels where San Villa Group Defendants employed Plaintiffs and other Filipino guest workers.

d.   He also helped to oversee and control the housing, transportation, training, placement and employment of the guest workers.

e.   Defendant Villanueva used threats, document-holding, retaliation and other means of intimidation to control the workers and compel their labor.

506.   Defendant Melgarejo participated in the recruitment and training of the guest workers in the Philippines and in the United States and helped supervise guest workers in the United States.

a.   Defendant Melgarejo helped to oversee the control, housing, transportation, training, placement and employment of the guest workers.

b.   Defendant Melgarejo used document-holding, retaliation and other means of intimidation to control the guest workers and compel their labor.

507.    Defendant Jucilyn assisted with the overseeing of the operations of the Enterprise.

a.    Defendant Jucilyn participated in the securing of contracts with New York-based hotels where some Plaintiffs were made to work.

b.    She assisted in housing most of the Plaintiffs in New Jersey homes and in transporting them to be interviewed in New York hotels.

c.    Defendant Jucilyn used document-holding, threats, and other means of intimidation to control the guest workers and compel their labor.

508.    Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. §§1962(c) and 1962(d), related by their common purpose to profit by recruiting, obtaining, processing and providing consistent, low-cost labor of Filipino H-2B guest workers to work in the United States.

509.    Specifically, Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo, and Jucilyn conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. §1961(1).

a.    Forced labor in violation of 18 U.S.C. §1589;

b.    Trafficking in persons for the purpose of forced labor and involuntary servitude in violation of 18 U.S.C §1590;

c.      Unlawful conduct with respect to documents in furtherance of trafficking in violation of 18 U.S.C. §1592(a);

d.      Immigration document fraud in violation of 18 U.S.C §1546;

e.      Mail and wire fraud in sending fraudulent visa applications to the U.S. Department of Labor and U.S. Citizenship and Immigration Services in violation of 18 U.S.C §§1341 and 1343, respectively;

f.      Interstate and foreign travel to further their unlawful scheme in violation of 18 U.S.C §1592.

510.    The RICO Enterprise, as well as each RICO Defendant, received monetary benefits from defrauding, exploiting, and trafficking Plaintiffs and other Filipino guest workers.  Their benefits were primarily in the form of recruitment fees, increased profits and income.

**Predicate Acts:**

Forced Labor: 18 U.S.C. §1589

511.    Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C §1589 as discussed in the First Cause of Action.

512.    From approximately 2007 to 2011, Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn used threats of serious harm and

threatened abuse of the legal process to obtain the labor of Plaintiffs and other Filipino workers.

513.   The RICO Defendants, through their agent and officer, Defendant Villanueva, caused Plaintiffs and other guest workers to work excessive hours for unlawfully low wages by threatening them with arrest and deportation, cancellation of their visas, and refusal to renew their visas.

514.   The RICO Defendants, through their agents, Defendants Villanueva, Melgarejo and Jucilyn, withheld updated copies of most Plaintiffs' Form I-94 cards. Upon information and belief, Defendants Villanueva, Melgarejo and/or Jucilyn kept the original copies of the Form I-94 cards, and refused to provide them to the Plaintiffs they were issued to, in violation of U.S. law.

515.   These predicate acts of forced labor furthered the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

Trafficking in Persons for the Purposes of Forced Labor and Involuntary Servitude: 18 U.S.C. §1590

516.   Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and involuntary servitude in violation of 18 U.S.C §1590 as discussed in the Third Cause of Action.

517.   From approximately 2006 through 2011, the RICO Defendants, through their agents, Defendants Villanueva, Melgarejo and Jucilyn, and in collaboration with Eurasiam Quest and/or San Villa Manpower Agency Corp., recruited, obtained, harbored, transported and provided Plaintiffs and other Filipino guest workers for forced labor and involuntary servitude.

518.   RICO Defendants recruited and obtained Plaintiffs and other guest workers from approximately 2007 to 2009.

a.   Several times in 2006 to 2009, upon information and belief, Eurasiam Quest and/or San Villa Manpower Agency Corp. coordinated and hosted meetings between guest workers and Defendant Villanueva, who was acting on behalf of San Villa Group Defendants to recruit guest workers to work for either San Villa Management, or Lincoln Road Employment Services or South Beach Employment Services.

b.   Defendant Villanueva traveled to the Philippines to meet with Plaintiffs and other potential recruits from approximately 2006 through 2009.

c.   RICO Defendants recruited and obtained Plaintiffs and other guest workers on behalf of all other Defendants using misrepresentations regarding working conditions and wages.

519.   From approximately 2007 to 2011, RICO Defendants, through their agents, Defendants Villanueva, Melgarejo and Jucilyn, harbored and transported Plaintiffs and other Filipino guest workers for the purposes of forced labor and involuntary servitude.

520.   From approximately 2007 to 2011, RICO Defendants, through their agent Defendant Villanueva and other agents of San Villa Group Defendants, also transported Plaintiffs and other Filipino guest workers from San Villa housing to their job sites at country clubs and hotels, and from one job site to another.

521.   Between approximately 2007 and 2011, RICO Defendants provided Plaintiffs and other Filipino guest workers to country clubs and hotels in Florida, South Carolina and in New York.

522.   RICO Defendants subsequently subjected Plaintiffs and other guest workers to forced labor and involuntary servitude.

523.   These predicate acts of trafficking for forced labor and involuntary servitude furthered the goal of the RICO Enterprise to profit by recruiting, obtaining, and providing low-cost Filipino labor to work in the United States.

Unlawful Conduct with Respect to Documents in Furtherance of Trafficking: 18 U.S.C. §1592(a)

524.   Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn willfully, knowingly and intentionally committed and/or conspired to commit predicate acts of unlawful conduct with respect to documents in violation of 18 U.S.C. §1592(a) as discussed in Plaintiffs' Second Cause of Action

525.   From approximately 2007 to 2011, RICO Defendants, through their agents, Defendants Villanueva, Melgarejo and Jucilyn, withheld the updated

copies of most of Plaintiffs' Form I-94 cards, mailed to San Villa Group Defendants by the U.S. Citizenship and Immigration Services.

526.   These predicate acts of unlawful conduct with respect to documents furthered the goal of the RICO Enterprise to profit by recruiting, obtaining, and providing low-cost Filipino labor to work in the United States.

Immigration Document Fraud:   18 U.S.C. §1546

527.   Defendants Villanueva, San Villa Management, Lincoln Road Employment Services, and South Beach Employment Services in the RICO Enterprise fraudulently obtained H-2B visas by knowingly making false claims and statements about the nature and location of the work and the wage to be paid in violation of 18 U.S.C. §1546.   The false claims and statements were made willfully, knowingly and intentionally.

528.   Defendant San Villa Management submitted an Application for Alien Employment Certification (Form ETA 750), a form that must be submitted to the U.S. Department of Labor in order to secure H-2B guest workers, signed by Defendant Villanueva in September 2008 that contained material misrepresentations .

529.   By signing the form, Defendant Villanueva certified that the twenty (20) guest workers sought would be employed as waiters or waitresses at the Kiawah Island Club in South Carolina.

530.   Defendant Villanueva also certified that each employee would work one shift per day, five days per week, and that the hourly rate of each employee would be $7.13.

531.   On Defendant San Villa Management's November 13, 2008 Petition for Nonimmigrant Workers (Form I-129), signed by Defendant Villanueva and submitted to the U.S. Citizenship and Immigration Services, Defendant San Villa similarly certified that twenty alien beneficiaries would work at the Kiawah Island Club as waiters or waitresses and work full-time earning $7.13 per hour.

532.   In a letter accompanying this petition, Defendant Villanueva also stated that Defendant San Villa Management had been unable to fill the available positions with U.S. workers despite actively seeking workers in the United States.

533.   However, once they arrived in Florida, Defendants failed to place most of the Plaintiff-beneficiaries at the Kiawah Island Club or failed to pay any of the Plaintiff-beneficiaries their promised wage rates.

534.   Defendants also compelled some Plaintiff-beneficiaries to work in positions other than as waiters or waitresses, and to work more than five days per week, all in direct violation of the certifications, described in the preceding paragraphs, made by Defendant San Villa Management to the government.

535.   Upon information and belief, San Villa Group Defendants submitted other Applications for Alien Employment Certification and Petitions for Nonimmigrant Workers on behalf of Plaintiffs and other guest workers containing misrepresentations during approximately the same time period.

536.   These predicate acts of immigration document fraud furthered the goal of the RICO Enterprise to profit by recruiting, obtaining, and providing low-cost Filipino labor to work in the United States.

Mail Fraud: 18 U.S.C. §1341

537.     As set forth in the preceding paragraphs, Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, and Villanueva fraudulently obtained H-2B visas.   Defendants also made, and/or conspired to make, false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into remaining in the employ of San Villa Group Defendants.

538.     Defendants used the mails on numerous occasions during 2007 through 2009 to further these fraudulent schemes.

539.     Upon information and belief, the fraudulent applications for labor certification and H-2B visas described in the preceding paragraphs were submitted to the U.S. Department of Labor and to the U.S. Citizenship and Immigration Services by U.S. postal service or by commercial carrier.

540.     Defendant Villanueva sent a letter dated November 13, 2008 to the U.S.C.I.S. Vermont Service Center that included fraudulent information regarding conditions of San Villa Management's employment, through the U.S. postal service or by commercial carrier.

541.     These willful, knowing, and intentional acts constitute mail fraud in violation of 18 U.S.C. §1341.

542.     These predicate acts of mail fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining, and providing low-cost Filipino labor to work in the United States.

Wire Fraud: 18 U.S.C. §1343

543.     As set forth in the preceding paragraphs, Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services and Villanueva fraudulently obtained H-2B visas.   Defendants also made, and/or conspired to make, false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into remaining in the employ of San Villa Group Defendants.

544.     Defendants used wire communications via telephone, fax, and/or email on numerous occasions to further these schemes.

545.     Upon information and belief, during 2006 through 2009, Defendant Villanueva sent emails to his Philippine agents describing the job openings for guest workers at San Villa Group Defendants.

546.     Upon information and belief, Defendant Villanueva also sent emails to potential recruits describing the available jobs at San Villa during 2006 through 2009.

547.     These willful, knowing, and intentional acts constitute wire fraud in violation of 18 U.S.C. §1343.

548.     These predicate acts of wire fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining and providing low-cost Filipino labor to work in the United States.

Unlawful Acts in Support of Racketeering Enterprises through Interstate and Foreign Travel: 18 U.S.C. §1592

549.     As set forth in the preceding paragraphs, Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment

Services, and Villanueva regularly engaged in, and/or conspired to engage in, interstate and foreign travel to carry on their unlawful activities.

550. With the assistance and coordination of either Eurasiam Quest or San Villa Manpower Agency Corp., Defendant Villanueva repeatedly traveled to the Philippines between approximately 2006 and 2009 to recruit and train Filipino workers.

551. Defendant Villanueva conducted in-person interviews with each Plaintiff and other applicants in the Philippines and discussed their conditions and terms of employment.

552. San Villa Group Defendants, through their agents and officers, Defendants Villanueva and Melgarejo, transported or caused to be transported some Plaintiffs from Florida to South Carolina, and vice-versa.

553. During approximately May through July 2010, Defendants transported most of the Plaintiffs and other guest workers from Florida to New Jersey to work in New York.

554. During approximately June 2010 through March 2011, Defendants, through their agents Villanueva and Jacilyn, transported most of the Plaintiffs and other guest workers from New Jersey to New York to be interviewed and to look for work.

555. These willful, knowing and intentional acts violate 18 U.S.C. §1592.

**Pattern of Related Racketeering Acts**

556.    The predicate acts of racketeering activity described above constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

557.    The predicate acts were related to the enterprise.   In carrying out the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing low-cost Filipino labor for work in the United States. Defendants in the RICO Enterprise utilized fraudulent recruitment methods and tactics designed to compel involuntary labor.

558.    Defendants in the RICO Enterprise repeatedly and systematically utilized mail fraud, wire fraud, immigration document fraud, and interstate and foreign travel to recruit Plaintiffs and other Filipino nationals and secure visas for them to work in the United States.

559.    Once Plaintiffs were in the United States. Defendants engaged in additional unlawful conduct, including forced labor, trafficking in persons, and unlawful conduct with respect to documents in furtherance of trafficking.

560.    Defendants engaged in the racketeering activity described in this Complaint repeatedly, beginning as early as 2006 through at least March 2011, with respect to approximately more than a hundred Filipino workers.

561.    Defendants engaged in these acts to obtain Plaintiffs' labor and compel Plaintiffs to continue working in exploitative working conditions for unlawfully low wages.

562.    Defendants in the RICO Enterprise relied on the racketeering acts described in this Complaint to conduct their regular business activities.   The above-named Defendants' racketeering acts have similar purposes: to profit from

the fraudulent recruitment and forced labor of Plaintiffs and other similarly-situated individuals, and to recruit, obtain, provide, and maintain a consistent Filipino H-2B guest worker labor force in the United States for San Villa Group Defendants.

563.   Defendants' acts have yielded similar results and caused similar injuries to Plaintiffs, including payment of high recruitment fees and security bond fees, assumption of interest-bearing debt, lost work opportunities, and lost or unpaid wages.

564.   As set forth in the preceding paragraphs, the racketeering acts have similar participants:   Defendants San Villa Management, Lincoln Road Employment Services, South Beach Employment Services, Villanueva, Melgarejo and Jucilyn.

565.   As set forth in the preceding paragraphs, Defendants directed their racketeering activities at similar victims:   Filipino workers seeking overseas employment.

566.   Defendants' acts have similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs, use of similar employment practices and policies with respect to Plaintiffs, and similar methods of coercion and control of Plaintiffs and other similarly-situated individuals.

**Conspiracy**

567.    Starting approximately around 2006, RICO Defendants devised, implemented, and coordinated a scheme to profit from recruiting, providing, and obtaining low-cost Filipino labor through the H-2B guest worker program.

568.    RICO Defendants conspired to obtain guest workers to place in various country clubs and hotels in Florida, South Carolina and New York by filing fraudulent applications for H-2B visas.

569.    Defendants also conspired to defraud the U.S. government, and to defraud and exploit Filipino guest workers by using misrepresentations regarding working conditions and pay to recruit workers, and by unlawfully underpaying, overworking, and eventually not providing any employment at all to the guest workers.

570.    RICO Defendants knowingly agreed to the overall objective of the conspiracy to increase profits by recruiting and exploiting low-cost Filipino laborers, and agreed to commit various predicate acts in furtherance of that scheme.

571.    In order to successfully perpetrate their scheme, San Villa Group Defendants utilized Defendants Villanueva, Melgarejo and Jucilyn, and formed a partnership with Eurasiam Quest and San Villa Manpower Agency Corp. to recruit and process Filipino guest workers.

572.    As evidence of the conspiracy, Defendant Villanueva, on behalf of San Villa Group Defendants, filed various fraudulent petitions for labor certification with the Department of Labor, and for H-2B visas with the U.S. Citizenship and Immigration Services starting in 2006.

573.    As explained in paragraphs below, the petitions filed by Defendant San Villa Management included false information, including a statement of San Villa Management's inability to recruit U.S. workers; the location of the employment site for the twenty (20) guest workers; a work schedule of one shift per day, five days per week; and wages of $7.13 per hour.

574.    Similar misrepresentations were made by Defendant Villanueva in connection with other labor certification applications and Form I-129 nonimmigrant petitions filed on behalf of the San Villa Group Defendants.

575.    In order to further effectuate the conspiracy, Defendants rented houses to place Plaintiffs and other guest workers, while Defendants Villanueva, and/or Melgarejo and/or Jucilyn supervised, directed and controlled the guest workers in each house.

576.    San Villa Group Defendants, through their agents Villanueva, Melgarejo and Jucilyn withheld the original Form I-94 cards of Plaintiffs and other guest workers whose visas were renewed.

577.    The conspiracy also required that RICO Defendants underpay and overwork the guest workers in order to profit from their labor.

578.    As evidence of the conspiracy, Defendant Villanueva, on behalf of San Villa Group Defendants, signed paychecks from 2006 to 2011 for Plaintiffs and other guest workers that did not include full payment for the hours Plaintiffs and other guest workers worked.

579.    The payment summaries produced by San Villa Group Defendants and distributed to Plaintiffs and other guest workers by Defendants Villanueva

and Melgarejo show that Defendants also made unlawful deductions from the wages of Plaintiffs and other guest workers and failed to pay the minimum wage and overtime payments required by Florida, New York and federal law.

580.   As a result of the conspiracy, Defendants have obtained profits through the exploitations of Plaintiffs and other guest workers.

**Injury**

581.   As a direct and proximate result of RICO Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries including, but not limited to, payment of exorbitant recruitment fees for job application, visas, and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; lost and unpaid wages, lost employment opportunities; and other pecuniary and/or losses to personal property.

582.   Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and/or threefold the amount gained from human trafficking, and attorney's fees and costs associated with this action and any other relief deemed appropriate.

### SIXTH CAUSE OF ACTION

Fair Labor Standards Act ("FLSA")

29 U.S.C. §§201 et seq.

583.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 582 as if set forth fully herein.

584.   Plaintiffs bring this claim against all Defendants.

585.   This claim is brought under 29 U.S.C §216(b).

586.   Defendants violated 29 U.S.C. §206(b) by failing to pay Plaintiffs the applicable federal minimum wage for all hours worked

587.   Each of the Plaintiffs worked in excess of forty (40) hours per week in one or more weeks during his/her employment with the Defendants.

588.   During a typical or average workweek when Defendants provided employment, each Plaintiff would be given an 8-hour work shift that would start, by way of example, at 9:00 a.m. and would end at 5:00 p.m.  More often, Defendants required Plaintiffs to extend his/her work hours, such that the total number of work hours for a given work week would exceed forty (40) hours.

589.   Plaintiffs were and have been entitled to premium compensation at one and one-half times the regular hourly rate ("overtime compensation") for those hours.

590.   Plaintiffs were paid on an hourly basis, and were not paid for any overtime hours worked in excess of forty hours in any given work week, for at least three (3) to six (6) months during the initial periods of their respective employment.

591.   Defendants generally paid Plaintiffs some overtime pay after the sixth month of employment, but based, not on the agreed-upon rate or not even on the minimum wage, but on a rate that was well below the minimum wage, that is, on $6.00 per hour.

592.   Defendants violated 29 U.S.C. §207 by failing to pay Plaintiffs overtime for all hours worked in excess of forty each week.

593.    Defendants' unlawful deductions from Plaintiffs' wages for recruitment fees and other recruitment-related fees. cumulatively brought Plaintiffs' wages below the statutory minimum.

594.    Defendants failed to pay Plaintiffs for each hour of work that they performed. or that they made themselves available to work for Defendants.

595.    Defendants' failure to pay Plaintiffs their federally-mandated minimum and overtime wages were willful violations of the FLSA within the meaning of 29 U.S.C. §255(a).

596.    Defendants either knowingly violated the FLSA or disregarded the very possibility that they were violating the FLSA.   Defendants were aware of the FLSA's requirements but failed to take the necessary affirmative actions to comply with these requirements.

597.    As a result of the above violations. Plaintiffs suffered damages.

598.    Plaintiffs are entitled to an award of their unpaid minimum and overtime wages. plus an equal amount in liquidated damages. reasonable attorney's fees and costs.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

599.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 598 as if set forth fully herein.

600.    Defendants. through their agents. employees. officers. and/or representatives. offered and Plaintiffs accepted. to obtain and maintain their immigration status. to provide full-time employment at government-approved

rates, to provide overtime pay at 1.5 times the regular wage rate for work over forty hours per week, to provide free housing and transportation in the United States, and to provide free return transportation to the Philippines.

601.    Plaintiffs advanced consideration for the promises set out in the employment contracts in that Plaintiffs paid fees to Defendants and their agents and/or representatives and left work and their families in the Philippines and traveled to the United States.

602.    Plaintiffs paid large sums of money, and entered into interest-bearing debts, surrendered other employment opportunities, incurred other financial losses, and performed work for Defendants and/or made themselves available or were suffered to work or wait for work for Defendants.

603.    Plaintiffs performed all of the conditions, covenants and promises in accordance with the terms and conditions of their agreements.

604.    Defendants failed to comply with their obligations under the contractually-binding agreements entered into with the Plaintiffs.

605.    As a direct result of Defendants' breach, Plaintiffs suffered and continue to suffer damages.

606.    Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

Fraud and Negligent Misrepresentation

607.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 to 606 as if fully set forth herein.

608.    Plaintiffs bring this claim against all Defendants.

609.    Defendants, being not only the employer of, but the immigration sponsor of the Plaintiffs, had a duty to give correct information to each of the Plaintiffs.

610.    Defendants made false representations to each Plaintiff that each of them knew or should have known was incorrect.

611.    Prior to and at the time of executing an employment contract and throughout the period of employment, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and deceptive statements and representations about existing facts, and knowingly and/or negligently made materially false and deceptive statements and representations about future actions with no intent to fulfill those promises to Plaintiffs, regarding the nature and terms and conditions of employment and the obtaining and maintenance of immigration status in the United States.

612.    Defendants knowingly and/or negligently failed to disclose material facts to Plaintiffs regarding the nature, terms and conditions of employment and the obtaining and maintenance of immigration status in the United States.

613.    Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay large recruitment fees, leave their homes and jobs in the Philippines and travel to the United States to work for Defendants and to remain in Defendants' employ.

614.   Plaintiffs reasonably relied on the representations of Defendants and their agents, employees and/or representatives and had no reason to believe that their representations were false.

615.   Plaintiffs were entitled to rely on the representations of Defendants and their agents, employees and/or representatives.

616.   As a direct and proximate result of the representations of Defendants and their agents, employees and/or representatives, Plaintiffs have been injured.

617.   Plaintiffs believed these representations, and in reasonable and justifiable reliance on the representations of Defendants and their agents, employees and/or representatives, Plaintiffs paid large sums of money, entered into interest-bearing debts, surrendered other employment opportunities, incurred other financial losses, continued working for Defendants to their detriment without receiving fair compensation for their labor, suffered emotional injury, incurred legal liabilities and harm to their present and future immigration and employment status, and suffered other injuries.

618.   Defendants showed willful, conscious, wantor and reckless disregard for Plaintiffs' rights and for the deleterious consequences and unjust hardship placed upon Plaintiffs as a result of the representations of Defendants and their agents, employees and/or representatives.

619.   Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.      Declaratory and injunctive relief;

2.      Compensatory damages;

3.      Punitive damages;

4.      Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

5.      Liquidated damages as authorized by FLSA, 29 U.S.C. §216;

6.      Attorneys' fees and costs;

7.      Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on each and every claim set forth herein.

Dated: New York, New York.
        April 14, 2012.


                        Yours, etc.


                        LAW OFFICE OF FELIX Q. VINLUAN


                        By: _____

                        Felix Q. Vinluan (FV6788)
                        469 Seventh Avenue, Suite 404
                        New York, NY 10018
                        Tel. No. 212-359-9578
                        Fax No. 212-359-9563
                        Email: fqvinluan@yahoo.com

                        *Attorneys for the Plaintiffs*


                                                                112

## VERIFICATION

STATE OF NEW YORK          )
COUNTY OF NEW YORK     ) S.S.

WE, MA. CECILIA M. DELGADO, RONALD L. ESPIRITU, GIVENCHY

MAE C. ALBERTO, ANTHONY S. ANTONIO, PATRICIA A. BALLESTEROS,

LESTER P. CAMPOS, REYNALDO P. DE LUNA, MARS A. ESCOBIDO,

MOISES JOHN T. QUE, and HANSEL H. YUSON, all of legal age and residents of

the state of New Jersey, after having been sworn in accordance with law, hereby state that

each of us is plaintiff in the within Action-Complaint. We have each read the foregoing

complaint and know the contents thereof. The contents are true to our respective

individual knowledge, except as to matters therein stated to be alleged upon information

and belief, and as to those matters, each of us believes them to be true.

| | |
|---|---|
| MA. CECILIA M. DELGADO | RONALD L. ESPIRITU |
| GIVENCHY MAE C. ALBERTO | ANTHONY S. ANTONIO |
| PATRICIA A. BALLESTEROS | LESTER P. CAMPOS |
| REYNALDO P. DE LUNA | MARS A. ESCOBIDO |
| MOISES JOHN T. QUE | HANSEL H. YUSON |

Subscribed to before me on this 14th day of April 2012 in New York, New York.

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2009

113

## VERIFICATION

STATE OF NEW YORK        )
COUNTY OF NEW YORK  ) S.S.

WE, JEROME M. ALMILLA, JOHN S. SARMIENTO and
ANNABELLE D. SIBAYAN, all of legal age and residents of New Jersey,
after having been duly sworn in accordance with law, hereby state that each of
us is a plaintiff in the within Action/Complaint.   We have each read the
foregoing complaint and know the contents thereof.   The contents are true to
our respective individual knowledge, except as to matters therein stated to be
alleged upon information and belief, and as to those matters, each of us
believes them to be true.


_Jerome Almilla 4/16/12_ _____        _____
**JEROME M. ALMILLA**                          **JOHN S. SARMIENTO**

_____
**ANNABELLE D. SIBAYAN**


Subscribed and sworn to before me this 16th day of April 2012 in New
York, New York.

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2009 13

VERIFICATION

STATE OF MARYLAND
CITY OF HAGERSTOWN ) S.S.


       WE, CONSTANTE L. BAUTISTA and JOEL E. NIPALES, both of legal age and residents of the State of Maryland, after having been sworn in accordance with law, hereby state that we are two of the plaintiffs in the within Action/Complaint.  Each of us has read the foregoing complaint and knows the contents thereof.  The contents are true to our respective individual knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, each of us believes them to be true.


_____
CONSTANTE L. BAUTISTA

_____
JOEL E. NIPALES


SUBSCRIBED AND SWORN to before me this _____ day of April 2012.

_____
Notary Public

CHRISTINA DIANE LANDERS
Notary Public
State of Maryland
Washington County
My Commission expires May 23, 2015

## VERIFICATION

**REPUBLIC OF THE PHILIPPINES** )
**CITY OF** ___CITY OF MANILA___ ) S.S.

    **I, IVAN GEORGE C. SANICO,** of legal age and a resident of the Philippines, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within Action/Complaint. I have read the foregoing complaint and know the contents thereof. The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                           **IVAN GEORGE C. SANICO**

SUBSCRIBED AND SWORN to before me this _____ day of April 2012.


                                    Notary Public


Doc No. _____
Page No. _____
Book No. _____
Series of _____

**BITKO O. TAJONERA**
Notary Public, City of Manila
Until December 31, 2013
Comm. No. 2012-035, Roll No. 54904
IBP No. 868890, Bulacan, 11-11-11
PTR No. 0534512, Mla., 02-07-12
MCLE Compliance No. III 0008225, 2-5-10

# VERIFICATION

**STATE OF CALIFORNIA** )
**CITY OF** _Palm Desert_ ) S.S.

    **I, ARIEL C. GADICHO,** of legal age and a resident of the State of California, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within Action/Complaint. I have read the foregoing complaint and know the contents thereof. The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                                  **ARIEL C. GADICHO**

SUBSCRIBED AND SWORN to before me this ___16___ day of April 2012.

                                         Notary Public

State of California
County of Riverside
Subscribed and sworn to (or affirmed) before me on
this ___16___ day of ___April___, 20_12_
By _ARIEL C GADICHO_, proved to me on the
basis of satisfactory evidence to be the person(s) who appeared
before me.
(Seal)        Signature _W Dobbs_

W. DOBBS
COMM. #1967714
NOTARY PUBLIC • CALIFORNIA
RIVERSIDE COUNTY
Commission Expires FEB 24, 2016